**In the Matter of the Petition of R.M.G. and E.M.G.**

**Appeal of J.H., Jr., et al.**

**No. 79–747.**

District of Columbia Court of Appeals.

Argued Jan. 29, 1981.

Decided Dec. 29, 1982.

---

Julian Karpoff, Arlington, Va., with whom Bobby B. Stafford, Alexandria, Va., was on brief, for appellants.

Benjamin F. Saulter, Washington, D.C., for appellees.

Before NEWMAN, Chief Judge, and MACK and FERREN, Associate Judges.

FERREN, Associate Judge:

In this case of competing petitions for adoption of a black child, we review a trial court decision granting the petition of the child's black grandparents and denying the petition of her white foster parents. Applying all relevant factors, the trial court found both families suitable to adopt the child, but concluded that the race factor tipped the scales in favor of the black grandparents.

Although race, among other factors, can be relevant in deciding between

competing petitions for adoption, the statute expressly incorporating that factor, as well as the trial court's application of it, must survive "strict scrutiny," in order to comport with the equal protection requirement of the Constitution. I conclude that the statute on its face withstands constitutional challenge but that the trial court's application is not sufficiently precise to satisfy the Constitution. The judgment accordingly must be reversed and the case remanded for further proceedings.

## I. STATEMENT OF FACTS AND PROCEEDINGS

D. was born September 22, 1977, to unwed, teenage, black parents. By that time, her father lived in Cleveland, Ohio; her mother, in Washington, D.C. In early January 1978, D.'s mother decided to give her up for adoption and signed papers relinquishing parental rights. She did not tell the natural father. Nor did she tell his mother and stepfather, appellees R.M.G. and E.M.G.

On January 6, 1978, the Department of Human Resources placed D. with foster parents, appellants J.H. and J.H., who are white. The foster mother realized almost immediately that D. was not healthy. D. was suffering from nausea and diarrhea and, although more than three months old, weighed only 10 pounds. D., moreover, was extremely lethargic and, according to Dr. Robert Ganter, a child psychiatrist, showed signs of mental retardation. During the next year, however, D.'s foster parents nurtured her to good physical and mental health.[1]

On April 26, 1978, a few months after D. came to live with them, J.H. and J.H. filed a petition for adoption. Initially, the Department of Human Resources recom-

mended approval. At the foster mother's insistence, however, the Department notified the child's natural father of the proposed adoption. He objected. His own mother and stepfather, R.M.G. and E.M.G., then filed a petition to adopt D. The natural father consented. The Department of Human Resources studied the grandparents' home and, withdrawing its earlier support of the foster parents' petition, recommended approval of the grandparents' petition.

At the hearing on both petitions beginning on April 27, 1979, the court received the following evidence: The foster parents have four other children—three natural and a fourth, a black male, by adoption. They are a military family, living on a racially integrated military base with racially integrated schools. When asked about the problems of raising a child of another race, the foster mother testified that she and her husband had begun "an affirmative program" with their adopted male child. For example, she had obtained pre-school black history and coloring books for their son. She testified, "I make sure he knows that he's not white. I don't care how long he lives with us, he's black, and he's beautiful, and he's ours."[2]

The child's natural grandmother and her husband also testified at the hearing. The grandmother has eight children (all by a previous marriage) of whom the youngest was 14 at the time of the hearing. She also has nine grandchildren, two of whom reside at her home (one is a few months younger than D.). Although the grandmother is employed outside the home, she testified that she would take a leave of absence to be with the child. Both the grandmother and her husband added that they wanted to raise D., that they were able to care for her,

1. At the adoption hearing in April 1979, Dr. Ganter testified that D. had "bloomed enormously" and was of "high average to above average intelligence." The trial court concluded: "As a direct result of [the foster parents'] *love, affection* and special efforts, the child prospered to her present state of good health."

2. The foster mother also testified that, although her adopted son had "had an adjustment period in his life" at which time he was seen by a psychologist, his problem "was not with his color, but with his adoption. He was convinced that I had given birth to him. Now he knows he was adopted, and he's progressing beautifully."

and that they desired to show her their love.

Doris Kirksey, a social worker, testified on behalf of the Department of Human Resources. She recommended D.'s placement with her grandparents "based on the premise that the best place for a child is . . . with blood relatives." Ms. Kirksey discounted any harm that might come to D. from removal from her foster family. She based her assessment, in part, on the advice of her agency psychiatrist, Dr. Frances Welsing.

The trial court asked Dr. Welsing to testify in person. Her position, in a nutshell, was that cross-racial adoption always will be harmful to a child and—at the very least—should be discouraged. She emphasized that a non-white child would encounter particular difficulties in a white home upon reaching adolescence. Dr. Welsing made her recommendation to the Department of Human Resources without having met the J.H. family. Most of Dr. Welsing's testimony concerned the problems of cross-racial adoption in a broad societal context.

In response to Dr. Welsing, the foster parents called their own expert, Dr. F. Jay Pepper. He identified several factors germane to adoption. He agreed that race should be considered, but only with respect to the attitudes of the particular family petitioning for adoption. Like Dr. Welsing, Dr. Pepper had not met J.H. and J.H.

After reciting the procedural history of the case, the trial court made the following findings and conclusions:

Colonel H_____ and his wife, Caucasians, presently have four children, one of whom is a Black adopted child. They are a stable, middle-income, affectionate family unit who will likely travel to some degree because of the father's military career. They clearly love the child in question.

The G_____ family is a stable Black family of modest means. Mr. G_____ is the second husband of Mrs. G_____, her first husband having died. She has raised eight children and also has nine grandchildren. At least two of the grandchildren reside in the G_____ home. Mr. and Mrs. G_____ are both employed. If the baby is placed in her care, she plans to take a leave of absence to be with the child. The Court is impressed with the affectionate nature and willingness of the G_____ family to sacrifice.

In any adoption, the paramount concern is the best interests of the child. In that regard, the Court should consider an array of factors. Among them are:

1. The age of the child.
2. The stability of the adopting family and reasons for seeking an adoption.
3. Financial and other resources available to the adopting family.
4. Existence of love and affection between the persons involved.
5. Blood relationships, if any.
6. Race.
7. Any other significant factors.

It is equally important that the Court weigh these factors in terms of past, present and future.

It is seen that the child is very young—less than two years old. In her young life she has already undergone significant and probably traumatic changes. According to expert testimony, these changes or shifts are permanently recorded by the mind. Similarly, it is agreed that sudden changes of the family setting or other vital parts of one's environment can cause uncertainty, emotional distress and a sense of insecurity. Having regard for the history of this case, it is predictable that another change in the life of this child will cause some degree of injury or harm to her.

The pivotal question becomes, given the available alternatives, evaluated now and for the future, what decision is prudent as being in the child's best interests? Some aspects of this case are clear. Both families have shown love and concern for the child. Both families are reasonably stable; the H_____ family has greater financial resources.

With regard to blood relationships, the evidence indicates that it is a factor but certainly not conclusive. Thus, in the absence of love, affection, stability, and other supportive traits, blood relationship alone confers no special right of parenting. Yet the question should also be weighed in the interest of family tradition, culture and other intangibles.

The question of race is important. It is interesting that all the experts who appeared in this matter agreed that not enough work has been done on the subject as it pertains to adoption. However unpleasant, it would seem that race is a problem which must be considered and should not be ignored or minimized. Conversely, there are not conclusive absolutes to be drawn on the basis of race. It would seem, however, entirely reasonable that as a child grows older the ramifications of this problem would increase. At a later stage, notwithstanding love and affection, severe questions of identity arising from the adoption and race most probably would evolve. In the world at large, as the circle of contacts and routines widens, there are countless adjustments which must be made. Given the circumstances in this case, the child's present status is relatively secure and carefree. The future, in each of its stages—childhood, adolescence, young adulthood, etc.—would likely accentuate these vulnerable points. The Court does not conclude such a family could not sustain itself. Rather the question is, is there not a better alternative? The Court is concerned that little medical or scientific attention has been devoted to this problem. The Court is concerned that, without fault, the H_____s stand to lose a beloved member of their family. However, our test remains the best interest of the child. It is believed that applying all of the factors to be considered, and evaluating the question in terms of past, present and future, that the appropriate alternative is adoption of the child by the G_____ family.

■ On June 1, 1979, the trial court granted the grandparents, E.M.G. and R.M.G., an "Interlocutory Decree of Adoption," which stated that the decree "shall automatically become final on [December 3, 1979], unless it shall in the interim have been set aside for good cause shown."[3] On June 6, 1979, the foster parents filed a "Supplemental Motion For Amendment of and Additions to Findings of Fact." The trial court denied the motion on June 12, 1979, and on July 3, 1979, also denied the foster parents' motion for a stay pending appeal.[4] The foster parents filed a timely appeal of the June 1 interlocutory decree on June 6, 1979.[5]

3. Under D.C.Code 1973, § 16–309(c), the trial court could not issue a final decree of adoption until the child had lived six months with her adopting parents. The statute permits the trial court to enter an interlocutory decree which, by its terms, will become final after six months unless the order is set aside for good cause shown during the interim period. *Id.,* § 16–309(d).

4. The foster parents petitioned this court for a stay of the adoption order pending appeal. We denied the petition on August 21, 1979. They petitioned for rehearing en banc. On October 19, 1979, we issued a stay of the trial court's order pending further order of this court while we considered the en banc petition. On August 11, 1980, we denied the petition for rehearing en banc but did not lift the stay of October 19, 1979. Counsel for the foster parents—perhaps anticipating an order dissolving the stay—filed a petition for a stay in the Supreme Court, which was denied on September 16, 1980. As of the date of oral argument—January 29, 1981 —counsel for both parties informed this court that D. remains with the foster parents.

5. Interlocutory orders are appealable to this court only under certain specified conditions not applicable in this case. *See* D.C.Code 1973, § 11–721(a)(2). Nonetheless, although the trial court's order properly was labeled as an "interlocutory order," *see id.,* § 16–309(c), (d); note 3 *supra,* we conclude the order was appealable as a final order, D.C.Code 1973, § 11–721(a)(1), under the doctrine of practical finality. *See Gillespie v. United States Steel Corp.,* 379 U.S. 148, 152–53, 85 S.Ct. 308, 310–311, 13 L.Ed.2d 199 (1964); *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed.

## II. THE STATUTE: ITS CONSTRUCTION AND APPLICATION

A petition for adoption "shall contain" information about the races of the petitioner and the prospective adoptee, *see* D.C. Code 1973, § 16–305(4) and (5),[6] unless "the prospective adoptee is an adult" or "the petitioner is a spouse of the natural parent" who consents to the adoption. *Id.* 1978 Supp., § 16–308.[7] The adoption statute, therefore, permits the court to take race into account, although it does not provide any guidance as to how the court is to do it. Nor does the legislative history. Instead,

the statute, *id.* 1973, § 16–309, simply states:

(b) . . . [T]he court may enter a final or interlocutory decree of adoption when it is satisfied that:

(1) The prospective adoptee is physically, mentally, and otherwise suitable for adoption by the petitioner;

(2) the petitioner is fit and able to give the prospective adoptee a proper home and education; and

(3) the adoption will be for the best interests of the prospective adoptee.

---

1528 (1949); *Rachal v. Rachal,* D.C.App., 412 A.2d 1202, 1204 (1980); *Bearstop v. Bearstop,* D.C.App., 377 A.2d 405, 407–08 (1977). But for the stay issued by this court, see note 3 *supra,* the order to remove D. from her foster home threatened irreparable harm to both D. and her foster parents. *See Rachal, supra* (order denying visitation rights to parent threatened both parent and child with irreparable harm). It would be contrary to the best interests of the child to allow her to settle into a new family for six months and only then, assuming no problem developed and the adoption decree became final, allow an appeal of the order taking the child away from her earlier environment. "The danger of denying justice by delay" in this situation clearly outweighs any concern against "the inconvenience and costs of piecemeal review" which might lead us to a contrary conclusion. *Gillespie, supra* 379 U.S. at 152–53, 85 S.Ct. at 310–311. Finally, because appellants filed this appeal within thirty days of the trial court's denial of their "Motion for Amendment of And Additions To Findings Of Fact," the appeal is timely. *See* D.C.App.R. 4 II(a)(1) and (2).

**6.** D.C.Code 1973, § 16–305 provides:

A petition filed for the adoption of a person shall be under oath or affirmation of the petitioner and the titling thereof shall be substantially as follows: "Ex parte in the matter of the petition of ――――――― for adoption." The petition or the exhibits annexed thereto shall contain the following information:

(1) the name, sex, date, and place of birth of the prospective adoptee, and the names, addresses, and residences of the natural parents, if known to the petitioner, except that in an adoption proceeding that is consented to by the Commissioner or a licensed child-placing agency, the names, addresses and residences of the natural parents may not be set forth;

(2) the name, address, age, business or employment of the petitioner, and the name of the employer, if any, of the petitioner;

(3) the relationship, if any, of the prospective adoptee to the petitioner;

(4) the race and religion of the prospective adoptee, or his natural parent or parents;

(5) the race and religion of the petitioner;

(6) the date that the prospective adoptee commenced residing with petitioner; and

(7) any change of name which may be desired.

When any of the above facts is unknown to the petitioner, the petitioner shall state this fact. When any of the above facts is known to the Commissioner, or a licensed child-placing agency that as a matter of social policy declines to disclose them to the petitioner, the facts may be disclosed to the court in an exhibit filed by the Commissioner or the agency with the court. If more than one petitioner joins in a petition, the requirements of this section apply to each. Congress originally enacted the provision in 1954. *See* D.C.Code 1961, § 16–214 (Pub.L. No. 392, 68 Stat. 242, ch. 272 § 7 (1954)).

**7.** D.C.Code 1978 Supp., § 16–308 provides:

Investigations when prospective adoptee is adult or petitioner is spouse of natural parent.

The court may dispense with the investigation, report, and interlocutory decree provided for by this chapter when:

(1) the prospective adoptee is an adult; or

(2) the petitioner is a spouse of the natural parent of the prospective adoptee and the natural parent consents to the adoption or joins in the petition for adoption.

In the circumstances specified in (2) above, the petition need not contain the information concerning race and religion specified by subparagraphs (4) and (5) of section 16–305.

Only two reported decisions in this jurisdiction address the question of race in an adoption proceeding. In *In re Adoption of a Minor*, 97 U.S.App.D.C. 99, 228 F.2d 446 (1955) (interpreting predecessor statute), the court held that the trial court improperly had denied a black stepfather's petition to adopt, with his wife's consent, his wife's white son. The court rejected the trial court's reasoning that the white child " 'might lose the social status of a white man by reason' " of his adoption by a black. *Id.* at 100, 228 F.2d at 447. The court reasoned:

> Nor can denial of the adoption rest on a distinction between the "social status" of whites and Negroes. There may be reasons why a difference in race, or religion, may have relevance in adoption proceedings. But that factor alone cannot be decisive in determining the child's welfare. It does not permit a court to ignore all other relevant considerations. Here we think those other considerations have controlling weight. [*Id.* at 101, 228 F.2d at 448 (footnote omitted).]

The court thus left open the possibility that race could be relevant to an adoption decision but did not specify what circumstances might justify its use.[8]

More recently, this court expressly confirmed the relevance of race to adoption. In *In re DeF*, D.C.App., 307 A.2d 737 (1973), a mixed-race couple, wishing to adopt a child of mixed race, refused to indicate their race or religion on the adoption petition, alleging that the statutory requirement was unconstitutional. *Id.* at 738. We cited *In re Adoption of a Minor, supra,* for the proposition that race can be a relevant factor, *In re DeF, supra* at 739 n. 3, but we declined to address the constitutional issue. We noted that there was no real question of the parties' race or the merits of the petition; thus, we approved the adoption as if the petition had been amended with the information the statute required. *Id.* at 739–40.[9]

In summary, neither the adoption statute itself nor the cases interpreting it provide much guidance as to whether race may be relevant to an adoption, consistent with the Constitution—especially in an adoption contest. Petitioners accordingly present a new constitutional challenge, alleging broadly that the "equal protection doctrine of the Constitution prohibits the use of skin color-defined race as a relevant issue in an adoption."[10]

## III. STRICT OR INTERMEDIATE SCRUTINY?

■ Over the years, the Supreme Court has held that a statute which on its face takes race into account is constitutionally suspect and must receive "strict scrutiny." *Regents of the University of California v. Bakke*, 438 U.S. 265, 290–91, 98 S.Ct. 2733, 2748, 57 L.Ed.2d 750 (1978) (Powell, J., an-

8. The court remanded with directions that the trial court grant the petition for adoption, *id.* at 101, 228 F.2d at 448, noting "that all the evidence relevant to the 'best interests' of the child firmly points in the direction of adoption . . . ." *Id.* at 101 n. 7, 228 F.2d at 448 n. 7.

9. Cf. *Pedersen v. Burton*, 400 F.Supp. 960, 963 (D.D.C.1975) (three-judge court) (per curiam) (statute requiring marriage license applicants to identify their race is unconstitutional).

10. We review the adoption statute, as applied here in terms of equal protection of the laws. I note that "[t]he Fifth Amendment, which is applicable in the District of Columbia, does not contain an equal protection clause as does the Fourteenth Amendment which applies only to the states." *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). As discussed in *Bolling*, however, Fifth Amendment due process contains an element of equal protection. Moreover, "it would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government" than required of the states by the equal protection clause of the Fourteenth Amendment. *Id.* at 500, 74 S.Ct. at 694. Accordingly, for purposes of this case, there is no material distinction between equal protection under the Fourteenth and the Fifth Amendments. *See, e.g., Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 (1975); *Obregon v. United States*, D.C.App., 423 A.2d 200, 202 n. 1 (1980), cert. denied, 452 U.S. 918, 101 S.Ct. 3054, 69 L.Ed.2d 422 (1981).

nouncing judgment of the court) (hereafter Powell, J., opinion); *McLaughlin v. Florida,* 379 U.S. 184, 191–92, 85 S.Ct. 283, 287–288, 13 L.Ed.2d 222 (1964); *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954); *Korematsu v. United States,* 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194 (1944). As a result, racial classifications will be held constitutional only if shown to advance a governmental interest that is "compelling," *Dunn v. Blumstein,* 405 U.S. 330, 342, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972); *Graham v. Richardson,* 403 U.S. 365, 375, 91 S.Ct. 1848, 1853, 29 L.Ed.2d 534 (1971), or "overriding," *Loving v. Virginia,* 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967); *McLaughlin, supra* 379 U.S. at 192, 85 S.Ct. at 288, and if the particular use of race is "necessary" to accomplish that purpose. *Bakke, supra* 438 U.S. at 305, 98 S.Ct. at 2756 (Powell, J., opinion); *In re Griffiths,* 413 U.S. 717, 722, 93 S.Ct. 2851, 2855, 37 L.Ed.2d 910 (1973); *Dunn, supra* 405 U.S. at 342, 92 S.Ct. at 1003; *McLaughlin, supra* 379 U.S. at 196, 85 S.Ct. at 290. The Court has said on a number of occasions, moreover, that a racial classification can be necessary to serve a compelling governmental interest only when "precisely tailored" to achieve its legitimate purpose. *Plyler v. Doe,* —— U.S. ——, 102 S.Ct. 2382, 2395, 72 L.Ed.2d 786 (1982); *accord Dunn, supra* at 405 U.S. at 343, 92 S.Ct. at 1003; *Zablocki v. Redhail,* 434 U.S. 374, 388, 98 S.Ct. 673, 682, 54 L.Ed.2d 618 (1978). As a consequence, some members of the Court have noted Professor Gunther's observation that, given the severity of the scrutiny, racial classifications generally do not survive; such scrutiny is " 'strict in theory and fatal in fact.' "

*Bakke, supra* 438 U.S. at 362, 98 S.Ct. at 2784 (Brennan, J., joined by White, Marshall, and Blackmun, JJ., concurring in the judgment in part and dissenting in part) (hereafter Brennan, J., opinion) (quoting Gunther, *The Supreme Court, 1971 Term— Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 HARV.L.REV. 1, 8 (1972)).

More recently, however, in the context of affirmative action plans intended to remedy past discrimination, four Justices concluded that "benign" racial classifications permit an intermediate standard of review between strict scrutiny and the more generally applicable "rational basis" test.[11] *Fullilove v. Klutznick,* 448 U.S. 448, 519, 100 S.Ct. 2758, 2795, 65 L.Ed.2d 902 (1980) (Marshall, J., joined by Brennan and Blackmun, JJ., concurring in the judgment) (hereafter Marshall, J., concurring); *Bakke, supra* 438 U.S. at 357, 361–62, 98 S.Ct. at 2782, 2784 (Brennan, J., opinion).[12] Under the intermediate approach, to justify an allegedly benign racial classification "an important and articulated purpose for its use must be shown." *Id.* at 361, 98 S.Ct. at 2784 (Brennan, J., opinion). More specifically, it must be a purpose that serves an important governmental objective to which the prescribed use of race is substantially related and which—in contrast with the usual situation when race is invoked—does not "stigmatize[ ] any group . . .," *id.,* by reflecting a "presumption that one race is inferior to another" or by putting "the weight of government behind racial hatred and separatism." *Id.* at 357–58, 98 S.Ct. at 2782 (Brennan, J., opinion); *accord Fulli-*

11. Recently, the Supreme Court referred to the rational basis test as follows: "In applying the Equal Protection Clause to most forms of state action, we thus seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose." *Plyler v. Doe,* —— U.S. ——, 102 S.Ct. 2382, 2395, 72 L.Ed.2d 786 (1982).

12. *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) upheld a statutory requirement that 10% of the federal funds awarded for local public works projects be set aside for minority business enterprises. *Regents of the Univ. of Cal. v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) struck down a medical school admissions program reserving a percentage of seats in the entering class for minorities.

*love, supra* 448 U.S. at 519, 100 S.Ct. at 2795 (Marshall, J., concurring).[13]

This acceptance of benign racial classifications, intended to further governmental interests that, while not compelling, are "important," *id.,* or "substantial," *Plyler, supra* 102 S.Ct. at 2395, reflects the intermediate or "middle-tier" scrutiny which the Court developed a number of years earlier to address sensitive, but not inherently suspect, classifications such as gender, *Craig v. Boren,* 429 U.S. 190, 197–99, 97 S.Ct. 451, 456–457, 50 L.Ed.2d 397 (1976); *id.* at 210, 97 S.Ct. at 463 (Powell, J., concurring); *see Mississippi University for Women v. Hogan,* —— U.S. ——, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982), and, more recently, alien children. *Plyler, supra. See generally* L. TRIBE, AMERICAN CONSTITUTIONAL LAW § 16–30, at 1082 (1978).

A majority of the Court, however, has not accepted this intermediate review standard for benign racial classifications of any sort. But even if that standard were applicable in the context of affirmative action to remedy past discrimination, as four Justices have urged, I would not find it applicable in a family-law context, where racial classifications over the years have resulted in particularly vivid examples of invidious discrimination. *See* Part IV.B.1. *infra.* I therefore conclude that strict scrutiny is required here; statutory recognition of race as a factor to be weighed in an adoption proceeding "call[s] for the most exacting judicial examination," on the ground that "[r]acial and ethnic distinctions of any sort are inherently suspect," *Bakke, supra* 438 U.S. at 291, 98 S.Ct. at 2748 (Powell, J., opinion). It follows that this "racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification." *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979) (upheld Massachusetts lifetime veterans pref-

erence under state civil service system against allegation of gender-based discrimination); *accord Washington v. Seattle School District No. 1,* —— U.S. ——, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982); *Crawford v. Los Angeles Board of Education,* —— U.S. ——, 102 S.Ct. 3211, 73 L.Ed.2d 948 (1982). I proceed, accordingly, to apply the traditional, strict standard of review.

## IV. STRICT SCRUTINY OF THE ADOPTION STATUTE, AS AUTHORIZED AND APPLIED.

The cases I have found concerning the use of race in an adoption statute do not discuss whether advancement of a child's best interest is a "compelling" governmental interest. *See, e.g., In re Adoption of a Minor, supra; Drummond v. Fulton County Department of Family & Children's Services,* 563 F.2d 1200 (5th Cir.1977) (en banc), *cert. denied,* 437 U.S. 910, 98 S.Ct. 3103, 57 L.Ed.2d 1141 (1978); *Compos v. McKeithen,* 341 F.Supp. 264 (E.D.La.1972) (three-judge court); *Beazley v. Davis,* 92 Nev. 81, 545 P.2d 206 (1976). Implicitly, though, the courts treat it as such—and I agree. The critical question, then, is whether the particular use of race, as authorized and applied, is "necessary"—and thus precisely enough "tailored"—to achieve the child's best interest.

### A. *Statutory Authorization of the Race Factor*

■ I turn, first, to statutory authorization. As noted earlier, the statute does not bar cross-racial adoption, which of course would be fatal. *See In re Adoption of a Minor, supra* at 101, 228 F.2d at 448; *Compos, supra* at 268. Thus, the racial classification is sustainable, if at all, only because it is one among a number of relevant factors. *See In re Adoption of a Minor, supra* at 101, 228 F.2d at 448; *Drummond, supra* at 1204–05; *Compos, supra* at 266.

---

**13.** In addition, the benign purpose, to survive intermediate scrutiny, may not "single[ ] out those least well represented in the political process to bear the brunt of a benign pro-

gram." *Bakke, supra* at 361, 98 S.Ct. at 2784 (Brennan, J., opinion); *accord Fullilove, supra* at 519, 100 S.Ct. at 2795 (Marshall, J., concurring).

■ There is, however, an important caveat: if race is to be a relevant factor, the court cannot properly weight it, either automatically or presumptively—*i.e.*, without regard to evidence—for or against cross-racial adoption. To do so would add a racially discriminatory policy to evaluation of the child's best interest. As a consequence, in an adoption contest, petitioners of a particular race would receive a head start, contrary to the constitutional requirement that the use of race—which is "presumptively invalid"—must be affirmatively justified. *Feeney, supra* 442 U.S. at 272, 99 S.Ct. at 2292; *see Compos, supra* at 266; *cf. In re Marriage of Kramer,* 297 N.W.2d 359, 361 (Iowa 1980) (in custody proceeding "no assumptions are automatically warranted by racial identity"; race can be a factor only if there is some "demonstrated relevancy").[14]

The question thus becomes: whether statutory authority to consider race among the factors relevant to adoption, without preference for the race of any party, can ever be "necessary" for a determination of the child's best interest. Appellants say it cannot be, alleging that the "equal protection doctrine of the Constitution prohibits the use of skin color-defined race as a relevant issue in an adoption." I cannot agree with that unqualified statement.

Whether adopted by parents of their own or another race, adoptees often find it difficult to establish a sense of identity.[15] "Identity," in this context, has at least three components: (1) a sense of "belonging" in a stable family and community; (2) a feeling of self-esteem and confidence; and (3) "survival skills" that enable the child to cope with the world outside the family.[16] One's sense of identity, therefore, includes perceptions of oneself as both an individual and a social being. While adoptive parents' attitudes toward the adoption and their child are not the only influence on that child, these parental attitudes do affect, to a significant extent, whether the child will feel secure and confident in the family and community.[17] Because race may be highly relevant to these parental attitudes, see note 17 *supra*—as the expert witnesses of both parties confirmed—it is relevant to the larger issue of the child's best interest. *See In re DeF, supra* at 739.

I conclude, accordingly, that in a significant number of instances where prospects for adoption are evaluated, those who are responsible for a recommendation and decision—social workers from the Department of Human Resources, expert witnesses at trial, and the trial court itself—will not be able to focus adequately on an adoptive child's sense of identity, and thus on the child's best interest, without considering

14. It is useful here to emphasize once again that, by inquiring whether a statutory racial classification is "necessary" to advance a "compelling" governmental interest, we are dealing with an inherently suspect, presumptively invalid classification; thus, the party who would *sustain* the classification has the burden of proving it survives strict scrutiny. This contrasts with a situation where an ostensibly race-neutral statute, or other state action, has a disproportionately adverse impact on a racial minority. Such a statute or action may be invidiously discriminatory or not, depending on its underlying purpose. In this situation, the party who would *invalidate* the statute has the burden of proving a discriminatory purpose. *See Rogers v. Lodge,* —— U.S. ——, 102 S.Ct. 3272, 3275–76, 73 L.Ed.2d 1012 (1982); *Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 274, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979); *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 240, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976).

15. *See In re C.A.B.,* D.C.App., 384 A.2d 679 (1978); *Mills v. Atlantic City Dep't of Vital Statistics,* 148 N.J.Super. 302, 372 A.2d 646 (1977). *See generally* A. Sorosky, A. Baran & R. Pannor, The Adoption Triangle (1979).

16. J. Ladner, Mixed Families: Adopting Across Racial Boundaries 284 (1977).

17. *Id.;* L. Grow & D. Shapiro, Transracial Adoption Today: Views of Adoptive Parents and Social Workers (1975); Silverman & Feigelman, *Some Factors Affecting the Adoption of Minority Children,* 58 Soc. Casework 554 (1977); R. Simon & H. Altstein, Transracial Adoption (1977).

race. Statutory authority for the court to take race into account, therefore, can be critically important in adoption proceedings. When considered among a number of factors, on the basis of evidence, without automatic or presumptive preference for an adoptive parent of a particular race, that criterion does not reflect a "racial slur or stigma" against any group. *United Jewish Organizations v. Carey,* 430 U.S. 144, 165, 97 S.Ct. 996, 1009, 51 L.Ed.2d 229 (1977) (plurality opinion); *see Drummond, supra* at 1205. It is a criterion that markedly contrasts with the impermissible use of race both in facially discriminatory statutes [18] and in facially neutral statutes—some referring to race,[19] others not [20]—masking invidious racial discrimination in the law either as enacted [21] or as administered.[22]

In sum, an inherently suspect, indeed presumptively invalid, racial classification in the adoption statute is, in a constitutional sense, necessary to advance a compelling governmental interest: the best interest of the child. It thus survives strict scrutiny—a result that is unusual, as racial classifications go, but not precluded.

### B. *Judicial Application of the Race Factor*

The fact that the adoption statute does not *per se* reflect an unconstitutional denial

of equal protection does not end our inquiry; for although—as a general proposition—the use of race, as one factor, may be necessary to serve the best interest of the child, there also is risk that this classification may be invoked in a racially discriminatory fashion. Thus, there remains the significant question whether the racial classification in the adoption statute, as applied in this particular case, is precisely enough tailored to the child's best interest to survive strict scrutiny, or suffers instead from a more generalized application that possibly reflects invidious discrimination.

I therefore turn to application of the statute. To provide perspective—to examine the risk of invidious discrimination—I begin with an historical look at the exercise of judicial discretion, applied to race, in adoption and child custody proceedings.

### 1. *Historical Perspective*

Thirty years ago, the Supreme Court of Washington awarded custody of the children of a black father and a white mother to the father simply because they resembled him:

> We do not question the mother's love for her children. But we have always stated, in divorce cases, that our primary

---

**18.** *See, e.g., Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (struck down Virginia antimiscegenation law); *Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1880) (invalidated state law limiting jurors to white males).

**19.** *See, e.g., Hunter v. Erickson,* 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969) (invalidated city charter requirement that majority of voters must approve any ordinance dealing with housing discrimination on the basis of race, religion, or ancestry); *Anderson v. Martin,* 375 U.S. 399, 84 S.Ct. 454, 11 L.Ed.2d 430 (1964) (invalidated amendment to Louisiana election law requiring designation of each candidate's race on nomination papers and ballots).

**20.** *See, e.g., Washington v. Seattle School District No. 1,* —— U.S. ——, 102 S.Ct. 3187, 73 L.Ed.2d *896* (1982) (affirmed invalidation of statewide initiative intended to stop school board's use of mandatory busing for purposes of racial integration); *Reitman v. Mulkey,* 387

U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967) (struck down California constitutional provision forbidding state interference with unfettered discretion of every person to decline to sell or lease real property to any person); *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954) (systematic exclusion of persons of Mexican descent from service as jury commissioners, grand jurors, and petit jurors); *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (ordinance prohibiting construction of wooden laundries without a license; licensors denied licenses to all 200 Chinese applicants while granting them to 79 of 80 non-Chinese applicants).

**21.** *See, e.g., Seattle School District No. 1, supra; Hunter, supra; Reitman, supra; Anderson, supra.*

**22.** *See, e.g., Hernandez, supra; Yick Wo, supra.*

concern is the welfare of the children. We owe that duty to all children brought into a divorce court, regardless of race, color, or creed. These unfortunate girls, through no fault of their own, are the victims of a mixed marriage and a broken home. They will have a much better opportunity to take their rightful place in society if they are brought up among their own people. [*Ward v. Ward,* 36 Wash.2d 143, 144–145, 216 P.2d 755, 756 (1950).] [23]

Abhorring such views, many professionals by the mid-1950's began to question the validity of statutes [24] and court decisions [25] barring cross-racial adoption, and many adoption agencies became willing to place black children in white homes. [26]   Southern adoption agencies, however, were still unreceptive to the idea.   One Georgia agency, for example, responded in 1954 to a Child Welfare League of America study by citing the state's anti-miscegenation statute: "Our laws prohibit interracial marriage. A child reared in a home with parents of a different race will be apt to meet and want to marry a person of his or her parents' background, not his own." [27]   Other agencies were concerned about—and deferred to—community prejudice against interracial adoption. [28]

An intent to discourage interracial marriage is not a sustainable rationale for implementing the adoption statute.  *See Loving, supra.*  Nor is even a well-intentioned effort to protect a child against com-

**23.** Calling this language "unfortunate," a Washington state court of appeals expressed its belief that the Supreme Court of Washington would overrule *Ward* if the issue again came before the court. *Tucker v. Tucker,* 14 Wash.App. 454, 455, 542 P.2d 789, 791 (1975).

**24.** *See, e.g.,* La.Rev.Stat. § 9:422 (1950); Tex. Rev.Civ.Stat.Ann. art. 46a § 8 (Vernon 1969) (repealed 1973).   Both statutes were declared unconstitutional. *See Compos v. McKeithin,* 341 F.Supp. 264 (E.D.La.1972); *In re Gomez,* 424 S.W.2d 656 (Tex.Civ.App.1967).

**25.** Most reported court decisions in this area concern use of race in custody, not adoption, decisions. *See generally* Annot., 57 A.L.R.2d 678 (1958).   Even the number of custody cases is sparse.   Several commentators have suggested that, in the absence of statute or judicial decisions, the common law tradition was against mixing races in a family. *See* Grossman, *A Child a Different Color: Race as a Factor in Adoption and Custody Proceedings,* 17 Buffalo L.Rev. 303, 309–10 (1968); Note, [*Adoption in Iowa*], 40 Iowa L.Rev. 228, 234–35 & n. 32 (1955); Note, *Racial Matching and the Adoption Dilemma: Alternatives for the Hard to Place,* 17 J.Fam.L. 333, 341 n. 43 (1978–79). Another reason why there may be few reported decisions before 1954 is that minority children may not have been placed through formal adoption systems. *See generally* J. Ladner, *supra* note 16.

**26.** *See generally* Grossman, *supra* note 25 at 318–25; L. Grow & D. Shapiro, Black Children— White Parents: A Study of Transracial Adoption 103 (1975); J. Ladner, *supra* note 16 at 56–71.

**27.** Grossman, *supra* note 25 at 323.  I emphasize this response because opposition to cross-racial adoption—well beyond the 1950's—has been part of a much broader history of segregation in this country, mandating separation of the races within the family. *See generally* D. Bell, Race, Racism & American Law 53–81 (2d ed. 1980); Grossman, *supra* note 25 at 303; Note, *Custody Disputes Following the Dissolution of Interracial Marriages: Best Interests of the Child or Judicial Racism?* 19 J. Fam. L. 97, 97–104 (1980–81).   Most states have barred interracial marriage at some point in their history, *see* Applebaum, *Miscegenation Statutes: A Constitutional and Social Problem,* 53 Geo. L.J. 49, 50–51 & nn. 5–15 (1964) (identifying 41 states which at one time had miscegnation -laws; 19 still had them at the time the article was published).   When, fifteen years ago, the Supreme Court declared miscegenation statutes unconstitutional in *Loving, supra,* 16 states still prohibited interracial marriage. *Id.* at 6 & n. 5, 87 S.Ct. at 1820 & n. 5.

**28.** Grossman, *supra* note 25 at 324, reported the following comments:

Interracial adoption presents "more than ordinary risks and difficulties, so long as there remains so much prejudice."

Acceptance by the community is "highly important."

The adoptive couple must consider "ramifications, friends, relatives, church, neighbors, own children, community."

We are strongly opposed because of "tradition, community unable to accept such placements generally, fear of repercussions."

The placement of a colored child in a white home would lead to many complications, "especially" when he reaches adolescence.

munity prejudice a proper justification, in itself, for an adoption decision.[29] This is not to suggest that such concerns motivated the trial court here. The point, rather, is to illustrate that there is a very real risk of misuse—of discriminatory application—of a racial classification in an adoption proceeding. We would be naive simply to ignore that possibility based on the commonly shared hope that times have changed. Thus, where race is a factor for the trial court to consider, appellate review of judicial discretion under the statute must be as exacting as our scrutiny of the statute itself.

### 2. Judicial Review of Trial Court Discretion

Unlike other reported cases concerning statutes administered in racially discriminatory ways, *see* note 22 *supra,* we do not deal here with a demonstrable pattern and practice. How, then, does the appellate court

review, for equal protection purposes, a single exercise of trial court discretion?

When we apply the abuse-of-discretion standard of review without regard to constitutional concerns, we check to be sure that the trial court has exercised its discretion within the range of permissible alternatives, based on all relevant factors and no improper factor. *See Johnson v. United States,* D.C.App., 398 A.2d 354, 365 (1979).[30] We then evaluate whether the decision is supported by "substantial" reasoning, *id.,*[31] "drawn from a firm factual foundation" in the record. *Id.* at 364.[32] We have noted, however, that the exigencies of trial sometimes do not permit much elaboration in support of a discretionary ruling. *Id.* at 365. Thus, depending on "the nature of the determination being made and the context within which it was rendered," the appellate court, if necessary, "may examine the record and infer the reasoning upon which the trial court made its determination." *Id.* at 366.[33]

---

**29.** *See In re Marriage of Kramer,* 297 N.W.2d 359, 361–62 (Iowa 1980); *Edel v. Edel,* 97 Mich. App. 266, 293 N.W.2d 792, 795–96 (1980); *Beazley v. Davis,* 92 Nev. 81, 545 P.2d 206, 207 n. 2, 208 (1976) (per curiam); *Commonwealth ex rel. Myers v. Myers,* 468 Pa. 134, 360 A.2d 587 (1976); *Commonwealth ex rel. Lucas v. Kreischer,* 450 Pa. 352, 299 A.2d 243 (1973); *Milligan v. Davison,* 244 Pa.Super. 255, 367 A.2d 299, 302 n. 3 (1976).

**30.** The appellate court "must determine whether the trial court's action was within the range of permissible alternatives" based on "all relevant factors pertaining to the pending decision .... The court reviewing the decision for an abuse of discretion must determine 'whether the decision maker failed to consider a relevant factor, whether he relied upon an improper factor, and whether the reasons given reasonably support the conclusion.' " *Johnson, supra* at 365 (citation omitted).

**31.** "[T]he appellate court should inquire whether the trial court's reasoning is substantial and supports the trial court's action." *Id.*

**32.** "An informed choice among the alternatives requires that the trial court's determination be based upon and drawn from a firm factual foundation. Just as a trial court's action is an abuse of discretion if no valid reason is given or can be discerned for it, ... so also it is an abuse if the stated reasons do not rest upon a

specific factual predicate." *Id.* at 364 (citations omitted).

**33.** We have stated the point in full as follows:

Determinations committed to the trial court's discretion do not submit themselves to a highly structured review for abuse of discretion as easily as do most administrative determinations. Administrative decisions typically are produced with such formality that the language of the decision provides a mechanism for evaluating it. The trial judge, ruling in the midst of trial, for example, is often confronted with situations that do not admit the amassing of a record and the enumeration of reasons upon which a structured review must depend. Consequently, in reviewing a trial court's exercise of discretion, an appellate court should take cognizance of the nature of the determination being made and the context within which it was rendered. If needs be, it may examine the record and infer the reasoning upon which the trial court made its determination, *see Berryman v. United States,* [D.C.App., 378 A.2d 1317 (1977) ], even though to do so in review of an agency's determination would constitute an unwarranted judicial usurpation of the administrative role. *See, e.g., Greater Boston Television Corp. v. FCC, supra* 143 U.S.App.D.C. [383] at 392–94, 444 F.2d [841] at 850–52. Nonetheless, both the trial judge and trial counsel should take pains to ensure

In this case, there can be no question that the trial court, in ruling on the petitions for adoption, acted within the proper scope of its discretion ("range of permissible alternatives"). Moreover, the court considered all the relevant factors prescribed by statute and no improper factor. Thus, the focus of our inquiry is limited to whether the court's reasoning was sufficiently "substantial," *id.* at 365, based on a "firm factual foundation" of record, *id.* at 364, to withstand strict scrutiny.

Because the trial court's decision here was rendered comfortably after trial, not subject, for example, to presures during "the midst of trial," *id.* at 365; *see* note 33 *supra,* the general justification for requiring us to "examine the record and infer the reasoning" the trial court used, *id.* at 366, is not present here. Even more importantly, because of the constitutional nature of the trial court's decision—requiring application of race in a manner precisely tailored to the child's best interest—there is no room for the appellate court to infer reasoning that the trial court may have intended but did not state. To do so would invite appellate court creation, and approval, of a racial analysis that may—or may not—have taken place. In the ordinary case, where the party challenging the trial court's discretion has the burden of proving abuse, the risks from appellate court deference to the trial court are minimal, as long as the *Johnson, supra,* criteria are met. See notes 30–33 *supra.* But given our responsibility for strict scrutiny of an inherently suspect use of a racial classification, with the burden on the party who would sustain it, see note 14 *supra,* we must hold that party, and thus the trial court itself, accountable for affirmatively justifying the judgment in every material respect. *See Feeney, supra,* 442 U.S. at 272, 99 S.Ct. at 2292; *Compos, supra* at 266.

that the record does reflect both the foundations and the reasoning behind the discretionary decision. [*Id.* at 365–66 (footnotes omitted).]

**34.**  See notes 15–17 *supra* & accompanying text.

It follows that only through detailed, written findings and conclusions will the trial court be able to explain its thinking process with sufficient clarity to assure the data needed for effective review. *See Johnson, supra* at 364–65 (quoted *supra* at notes 31–32); *cf. Moore v. Moore,* D.C.App., 391 A.2d 762, 770 (1978) (detailed, written findings required in all custody cases); *Utley v. Utley,* D.C.App., 364 A.2d 1167, 1170 (1976) (same); *O'Meara v. O'Meara,* D.C. App., 355 A.2d 561, 562 (1976) (same). This case accordingly must turn on whether the trial court's written decision itself demonstrates that the court properly analyzed the racial issue, asked and answered the critical questions, and then precisely tailored its use of race to the best interest of this particular child.

I therefore turn, first, to the analytic steps and questions respecting race that the trial court should be expected to address. I then take up the trial court's exercise of discretion—its findings and conclusions themselves.

### 3.  *Proper Analytic Steps and Relevant Questions As to Race*

When race is relevant in an adoption contest, the court must make a three-step evaluation: (1) how each family's race is likely to affect the child's development of a sense of identity, including racial identity; (2) how the families compare in this regard; and (3) how significant the racial differences between the families are when all the factors relevant to adoption are considered together.

In taking the first step concerning identity,[34] the court must evaluate the probable effect of each family's race and related attitudes on the child's sense of belonging in the family and community,[35] the child's

**35.**  *See In re Marriage of Mikelson,* 299 N.W.2d 670, 673–74 (Iowa 1980) (comparing actions of two prospective, white adoptive parents in terms of contributions each had made toward helping black foster child develop sense of racial identity).

self-esteem and confidence,[36] and the child's ability to cope with problems outside the family.[37] Relevant questions bearing on one or more of these concerns, for example, would be: To what extent would the family expose the child to others of her own race through the immediate family? Through family friendships? Through the neighborhood? Through school? What other efforts will the family most likely make to foster the child's sense of identity—including racial and cultural identify—and self-esteem? To what extent has the family associated itself with efforts to enhance respect for the child's race and culture? To what extent has the family reflected any prejudice against the race of the child it proposes to adopt?

When the court takes the second step in the analysis—comparing the families—it hardly would be surprising if the answers to these questions favor prospective parents of the same race as the child.[38] But even when that is true, it is also possible that prospective parents of a different race may receive very positive ratings on these questions. If so, the third analytic step—how significant the racial differences are when all relevant factors are taken together—becomes especially important; for in that situation the racial factor may present such a close question that it will not have the significant, perhaps determinative, impact that it would if racial differences between parent and child simply were deemed a wholly negative factor.

### 4. The Trial Court's Analysis: Findings and Conclusions

In the present case, the trial court obviously was conscientious and thorough, properly treating race as only one of several relevant considerations. After reviewing the other concerns specified by statute, the court took the first analytic step as to race, beginning with the proposition—for which there was testimonial support—that "race is a problem which ... should not be ignored or minimized." The court carefully noted, however, that, "[c]onversely, there are not conclusive absolutes to be drawn on the basis of race.... The Court is concerned that little medical or scientific attention has been devoted to this problem." But the Court then found that generally "as a child grows older the ramifications of this problem would increase," and "severe questions of identity arising from the adoption and race most probably would evolve." As a consequence, the court concluded that racial differences between parent and child should be weighed as a negative factor in evaluating adoption.[39] The court then announced its decision, preceded by a rhetorical question: "The Court does not conclude such a[n interracial] family could not sustain itself. Rather, the question is, is there not a better alternative?" The Court answered in the affirmative. I understand the court to have concluded that although the other factors, taken together, may have slightly favored the white foster family, or at least given it equal standing to adopt,

**36.** See Greene v. Catholic Social Serv., 227 Pa. Super. 589, 590, 306 A.2d 919, 920 (1973) (white woman seeking custody of black girl considered her "different and of a lower moral fibre because she was black").

**37.** See J. LADNER, supra note 16 at 284. All black children, whether adopted or not, must be taught "survival skills"—that is, ways to cope with discrimination encountered in the world outside the family. To be capable of teaching survival skills, the family itself must be sturdy enough to stand up to any prejudice it may encounter. See In re Marriage of Mikelson, supra at 674; J. LADNER, supra at 215; Grossman, supra note 25 at 333–34. See also Chimezie, Transracial Adoption of Black Chil-

dren, 20 Soc.Work 296 (1975); Note, Racial Matching and the Adoption Dilemma: Alternatives for the Hard to Place, 17 J.Fam.L. 333, 360–61 (1979); R. Simon & H. Altstein, supra note 17 at 89–107.

**38.** Thus, contrary to our dissenting colleague's understanding of our opinion, I do not disagree with the proposition that there can be "a preference for intraracial adoption that is supported by evidence." Post at 805–806.

**39.** The court was explicit in saying it would not rule out a cross-racial adoption if there were only the one petition at issue.

the race factor tipped the decision in favor of adoption by D.'s black grandparents.[40]

In examining the trial court's decision, I note the following: First, the court conducted a three-day hearing during which it observed the demeanor of witnesses and assured a thorough presentation of evidence, including expert testimony on the general aspects of the racial issue (neither expert was familiar with the families seeking to adopt). Thus, presumably the court had before it each family's best possible personal presentation on the racial issue, as well as the best possible case for each family based on expert views concerning the effects of race on adoption generally.

■ Second, the court expressly disclaimed that it could draw on "conclusive absolutes" as to race; it referred to "the total circumstances in this case," while "applying all of the factors to be considered" (each of which the court discussed) "and evaluating the question in terms of past, present, and future."[41] In sum, the court specifically eschewed a dogmatic concentration on race, openly discussed all the relevant factors (age of child, stability of family, financial and other resources, love and affection, blood relationship, race), did not rely on an irrelevant factor, and manifested a thoughtful weighing process. See Johnson, supra at 365. The fact that race apparently tipped the decision in favor of appellees, see note 40 supra, does not, in itself, suggest a discriminatory result. See Drummond, supra at 1205.

Third, the court's analysis, as far as it goes, is supported by testimony of record. See Johnson, supra at 364.[42]

■ The trial court, therefore, obviously was careful and concerned and did not necessarily reach an impermissible result. Nonetheless, while correctly beginning with the first analytical step as to race focusing on growth of the child's sense of identity, the court made no specific findings (reflecting the kinds of questions listed above) as to how race would be likely to affect this particular black child growing up, respectively, in the families of J.H. and J.H. and of E.M.G. and R.M.G. Furthermore, aside from reciting facts about the racial makeup of each family, the court did not articulate the comparative analysis required by steps two and three: how the families compare in their respective abilities to accommodate race, and how significant racial differences between the families are when all factors

**40.** I understand the trial court, in its analysis quoted in full in the text above, to have found the families equally stable and loving toward the child. The court further found the grandparents preferable with respect to blood relationship; the white foster parents were preferable as to financial resources. The court also found "it is predictable that another change in the life of this child [from the H— to the G— family] will cause some degree of injury or harm to her." As to these factors taken together, therefore, the G.s' claim apparently was somewhat less than, or at best equal to, that of the H.s'. The court thus turned to race as the apparently determinative factor.

I do not agree with our dissenting colleagues that "[t]he trial court found ... that all relevant factors, other than race, were in equipoise." Post at 796 n. 1.

**41.** When the court said it did not conclude the interracial family "could not sustain itself," and added that "the question is, is there not a better alternative?", this rhetorical question did not reflect a view that racial differences would be—automatically or presumptively—a negative factor in every case. Rather, in context,

the court correctly noted that the critical question is not whether D. could prosper if adopted by her foster parents—a question that presumptively, and improperly, would have favored appellants—but instead: What family under all the circumstances presents the better alternative, given problems of identity affected by race?

**42.** Also, no one has accused the court of harboring a discriminatory intent. Because we deal with an inherently suspect racial classification, however, the question of trial court intent is not directly at issue, as it would be if a facially neutral statute were involved. See note 14 supra. Thus, although direct evidence of discriminatory intent would be relevant to show that judicial application of the statute could not survive strict scrutiny, the absence of such evidence does not help establish that the trial court's use of race was precisely tailored to the child's best interest. In this respect, I disagree with the analysis in Drummond, supra at 1205.

relevant to the adoption are considered together.[43]

■ Because the race factor is determinative here, see note 40 *supra,* I conclude that the trial court's analysis did not provide the reasoning and detail necessary to assure a reviewing court that the evaluation of race was precisely tailored to the best interest of the child. To repeat, for effective review when race is a critical factor, this court needs to understand exactly how the trial court made the judgment as to race that it did: whether as a precisely analyzed determination, based on carefully thought through comparisons of the parties drawn from record evidence, or as a more generalized conclusion that race always favors petitioners of the same race (here appellees)—a judgment reflecting an impermissible intellectual shortcut.

■ In a case such as this, where there is every indication from the trial court's analysis that, but for considerations of race, the decision might have been different, any determination as to race that is not precisely articulated on a comparative basis will fail to survive strict scrutiny. Given the trial court's opinion, which could be read to say that appellants—the J.H. family—were slightly favored but for race, see note 40 *supra,* an articulation of how close the race question is will be necessary to assure this court that the result is constitutionally justifiable. Otherwise, the risk that race will be misused is too high, even when there is no reason to believe the trial court is intentionally discriminatory.

## V. CONCLUSION

In summary, the statute, with its explicit recognition of race among the factors rele-

vant to adoption, does not deny equal protection of the laws. However, the trial court, in granting the petition of R.M.G. and E.M.G. to adopt D., did not articulate its analysis of the race factor in sufficient detail to assure a reviewing court that the application of that factor, in conjunction with the other relevant considerations, was precisely tailored to the best interest of the child. Nor, of course, is this appellate court in a position to dictate any result here. Accordingly, we must reverse the judgment of the trial court and remand the case for further proceedings consistent with this opinion.

*So ordered.*

MACK, Associate Judge, concurring:

In joining the disposition ordered by Judge Ferren, I find it necessary to say in my own words what is, and is not, in issue here.

At the outset, I see no need to reach the constitutional issue of equal protection. *Cf. In re DeF,* D.C.App., 307 A.2d 737 (1973). The Adoption Statute mentions race and religion only as factors to be supplied along with other information in a petition for adoption. D.C.Code 1973, § 16–205. It *does not require* that the court give these factors any consideration whatever;[1] it only provides that the court, after the consideration of the petition and other evidence, may enter a decree when it is satisfied that the adoptee is suitable for adoption, that the petitioner is fit and able to provide a proper home and education, and that the adoption will be for the best interest of the adoptee. *Id.* § 16–309. We are thus not faced with a statutory scheme separating persons solely on the basis of

---

**43.** I have noted earlier that under the circumstances of this case, and especially because of its constitutional nature, there is no basis for us to "examine the record and infer the reasoning the trial court used." *Johnson, supra* at 366. This conclusion is made stronger by pointing out that none of the expert witnesses made the kind of comparative analysis required here. Thus, there is no analysis of record which we could say the trial court adopted. We must

rely exclusively on the trial court's own analysis.

**1.** While *In re DeF, supra,* has been cited for the proposition that race is a relevant factor in adoption proceedings, it has not been held relevant for constitutional purposes. This court declined to meet the constitutional issue in that case.

racial classifications (*see Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967)), or an affirmative action program allegedly giving preference on the basis of racial classifications (*see Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978)). Therefore, however tempted one may be to re-argue interesting constitutional issues, I may refrain from doing so. Instead I may agree, magnanimously, with both of my colleagues that the statute is constitutional and add, uncharitably, that I do not think their arguments are relevant.[2]

I think that reversal is required in this case because the trial court, unwittingly, employed the factor of race as an impermissible *presumption.* In *Bazemore v. Davis,* D.C.App., 394 A.2d 1377 (1978) (en banc), we held that a presumption based upon the sex of a parent has no place in custody proceedings. Similarly, I suggest, a presumption based solely upon the race of competing sets of would-be parents has no place in adoption proceedings. In both instances the court is weighing the best interest of a particular child—an interest in which the human factor of love is paramount. As we noted in *Bazemore,* a "norm is ill suited" for making that determination and it must be made "upon specific evidence relating to that child alone." *Id.* at 1383.

I do not think, moreover, that the fact that the trial court did not speak in terms of a presumption, or the fact that it might have relied upon the testimony of an "expert" (who had never met the parties) made its ruling rest on more than a presumption.

The very statement of the issue confirms this fact. "[W]hen all other factors are in equipoise" [as between competing sets of prospective parents], a consideration that tips the scales on the basis of race *per se* (with reasoning that "potential future hardships" or questions of identity would "probably . . . evolve" from interracial adoptions) is of course a consideration in the nature of a presumption. A presumption is nothing more than a guess based upon probabilities (*see Bazemore, supra* at 1382 n. 7)—upon probabilities that, here, have not been conclusively established.

In a custody or adoption proceeding, we are not concerned with the best interest of children generally; we are concerned, rather, with the best interest of THE child. While my colleagues are quibbling about "strict scrutiny" and "intermediate scrutiny," a little girl is reaching school age under the care of the only parents she has even known. Because I agree with Judge Ferren that a trial court faced with such a "Solomonic"[3] task, must affirmatively justify its judgment in every material respect, I would reverse and remand for a particularized determination, taking into consideration factors bearing uniquely upon this child's adjustment and development including the significance of giving "full recognition to a family unit already in existence." *See Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511 (1978). For this purpose, at least, I would downgrade the emphasis on race to the significance it should deserve.[4]

2. If the statute is to be read as either of my colleagues read it, I would find it unconstitutional. While I agree that the parties' *attitudes* toward race may be very relevant, I do not think that a racial classification *per se* is necessary to accomplish the purpose of protecting the interest of an adoptee.

In a similar context the Supreme Court has held that sex-based distinctions in a state statute governing adoptions are impermissible under the equal protection clause of the Fourteenth Amendment. The best interest of a child must be determined without resort to inflexible gender-based distinctions which do not bear a substantial relation to some impor-

tant state interest. *See Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979).

3. *See* 1 *Kings* 3:16–28.

4. While I can agree that this is a most difficult decision, my brother Newman's discussion of the risks of interracial adoptions brings to mind a quote from the farewell speech to Congress of the last of the post-Civil War (black) congressmen. Representative George H. White (1852–1918), (replying to the suggestion of a colleague that the race question might be settled along sentimental lines when the Society for the Prevention of Cruelty to Animals shall

NEWMAN, Chief Judge, dissenting:

In this proceeding, the trial court considered the competing adoption petitions of a black child's natural grandparents and her white foster parents. The trial court found that, where the totality of other factors were in equipoise,[1] the interests of the child, D.G., would more likely be better served by an intraracial adoption than by an interracial one. This factual conclusion was more than adequately supported by the unusually thorough testimony addressed to the subject. The ensuing adoption order must therefore be sustained unless the Constitution prohibits taking note of the races of the parties involved even for the limited and important purpose addressed by the trial court: to weigh the possibility that racial differences between adoptive parents and child may adversely affect[2] the latter's future development and welfare. I think it is clear that the Constitution does *not* require a court to ignore racial differences between prospective parent and child, to the extent that such differences must be observed in order to judge that best interest.

However, the majority has managed to overturn the trial court's judgment by taking what I think is an overly stilted view of the relevance of race to adoption, disregarding the weighing process implicit in the court's expressed reasoning, and thereby concluding that its consideration of race may have been "insubstantial." The prescribed remedy—remanding for further proceedings—will probably do no harm. It is clear from the opinion and trial record, however, that there was no improper consideration of race to be remedied, and it is unlikely that a wordier opinion will make it easier to detect and overturn abuses if and when they occur in the future.

## I. THE NATURE OF THE TRIAL COURT'S DECISION

In the trial court, both sets of prospective adoptive parents had an opportunity to present any and all available evidence bearing on how the child's best interest would be affected by either of the alternative placements, including potential effects of racial differences, and any factors mitigating those risks. After a thorough hearing, the trial court was able to judge such factors as the families' respective financial resources, blood relationships with the child, the effect of a shift in custody away from the family with temporary custody, family stability, and the sort of love and care that each family could be expected to provide.[3]

overcome the difficulty of the difference between lions and lambs) observed:

> But what will my good friends of Virginia do with the Bible, for God says that He created all men of one flesh and blood? Again, we insist on having one race—the lion clothed with great strength, vicious, and with destructive propensities, while the other is weak, good natured, inoffensive, and useful—what will he do with all the heterogeneous intermediate animals, ranging all the way from the pure lion to the pure lamb, found on the plantations of every Southern State in the Union? [BROWN, DAVIS, LEE: THE NEGRO CARAVAN (1941).]

1. The majority has stated that the trial court's examination of all factors, other than race, "slightly favored" the white foster family and that the race factor "tipped the decision in favor of adoption by D.'s black grandparents." *Ante* at 793 & n. 40. I disagree with that characterization. The trial court found, as is shown by these portions of its opinion quoted by the majority, *ante* at 781–782, that all relevant factors, other than race, were in equipoise. Even if the majority's reading of the record were correct, I would reach the same analytical results, and I do here.

2. *Advantages* that interracial adoptions might conceivably have over intraracial adoptions in promoting the child's best interest, if raised by the parties, would also be relevant. However, it is not contended that interracial adoptions are, other things equal, *superior* to intraracial ones. *See infra* at 798.

3. Race was considered by the trial court as merely one of numerous relevant factors and not as a determinative or conclusive factor. There is not the least intimation in the trial judge's opinion that an otherwise fit family of a different race can never be granted adoption as against a family of the same race, regardless of its fitness. Thus, the court's decision is not inconsistent with cases prohibiting state action which gives race automatically controlling dimension in custody or adoption decisions. *See*

The court was in an unusually good position to judge with respect to the H. family, for they had already had custody for some time on a temporary basis. Moreover, they have another adopted child, who, unlike the parents, is black. The court thus had before it evidence of affirmative steps taken by the parents to mitigate some of the potential problems arising in an interracial adoption.

Q. Have you made particular efforts to cultivate his black heritage, and maintain the presence of that in your household?

A. We definitely began an affirmative program when Jeff came to live with us.

Q. How long has Jeff been with you?

A. Jeff came to live with us when he was eight days old, so he has been with us almost six years. He'll be six in August.

Needless to say, being in the military, we live in a thoroughly integrated society, and much more accepting than you would find in most civilian communities. Through guidance of friends and associates of my husband, the chaplain at the chapel where we go to church—one of our chaplains is black—I have gotten in magazines, and I have some pre-school black

history books for my son, a black coloring book for children, put out by Ebony Jr. I make sure he knows that he's not white. I don't care how long he lives with us, he's black, and he's beautiful, and he's ours.

Having weighed all this evidence, the court found as a fact that considerations other than the difference in race between the child and one set of adoptive parents were in equipoise.[4]

The court then turned to a consideration of the possible effects of racial differences between parents and child, and concluded that the possibility of adverse effects in the H. family tipped the balance in favor of the G. family. This conclusion was based on considerable expert testimony, which the majority opinion recites in part. It is evident that neither the parties nor the court approached this issue lightly. Indeed, when a social worker indicated that her testimony was largely based on the views of Dr. Welsing, the agency psychiatrist, the court requested that Dr. Welsing testify in person. After weighing facts and expert opinion on both sides, the court observed that conclusive data on the efficacy of interracial adoption is lacking.[5]

*In re Adoption of a Minor,* 97 U.S.App.D.C. 99, 228 F.2d 446 (1955); *Compos v. McKeithin,* 341 F.Supp. 264 (E.D.La.1972); *In re Gomez,* 424 S.W.2d 656 (Tex.Civ.App.1967). While some courts have held that race can never be a relevant factor in a custody or adoption proceeding, *Beazley v. Davis,* 92 Nev. 81, 83, 545 P.2d 206, 208 (1976); *DeLander v. DeLander,* 37 U.S.L.W. 2139 (Cal.Super.Ct., Aug. 14, 1968), the better view, and the view adopted by this court in this case, is that race may be considered a relevant factor in such proceedings. *See Drummond v. Fulton County Dept. of Family and Children's Services,* 563 F.2d 1200, 1205–06 (5th Cir.1977) (en banc), *cert. denied,* 437 U.S. 910, 98 S.Ct. 3103, 57 L.Ed.2d 1141 (1978). *Farmer v. Farmer,* 109 Misc.2d 137, 147, 439 N.Y.S.2d 584, 590 (Sup.Ct.1981).

4. As I have noted, the majority does not agree that all considerations except the race factor were in substantial balance. *Ante* at 793 n. 40. Evidently it assumes that the evidence regarding a healthy racial and cultural identity in the interracial context was ignored by the court in considering the love and care that would be provided by each family. The majori-

ty thus considers that the balance favored the white foster family *without* consideration of the family's testimony. This interpretation is at best debatable. But even if one assumes that such a balance exists *before* consideration of mitigating efforts, and those efforts are then considered separately, along with the impact of the racial difference between parents and child, the proper result would be the same. Since even the best efforts of parents cannot totally eliminate the potential for future problems, the race factor could still tip the balance. *See infra* at 799.

5. The lack of empirical data is especially acute as regards the crucial adolescent years, which typically strain the relations between parents and children and are important in the formation of a healthy self-concept. To date, all of the major studies have focused on pre-adolescents, and thus even those researchers most sympathetic to interracial adoption concede that the jury is still out regarding the ultimate viability of such placements. J. LADNER, MIXED FAMILIES 109, 249 (1977). The following comment is typical: "In view of the age of the

While there is a debate among social scientists about the viability of interracial adoption,[6] no one—including the parties herein and their expert witnesses—contends that such adoptions tend to be *superior* to intraracial adoptions, all other factors equal. Rather, the dispute concerns the degree to which the fact of a racial differ-

children in the study, it is not possible to give a definitive answer to the question whether white parents can deal successfully with the problem of racial identity." Grow & Shapiro, *Adoption of Black Children by White Parents*, 54 CHILD WELFARE 57, 59 (1975) [hereinafter cited as Grow & Shapiro, *Adoption*]; *see also* L. GROW & D. SHAPIRO, BLACK CHILDREN-WHITE PARENTS 233–34 (1974) [hereinafter cited as GROW & SHAPIRO I]; B. JACKSON, FAMILY EXPERIENCES OF INTER-RACIAL ADOPTION 19 (1976); R. SIMON & H. ALTSTEIN, TRANSRACIAL ADOPTION 49, 187 (1977) [hereinafter cited as SIMON & ALTSTEIN I]; R. SIMON & H. ALTSTEIN, TRANSRACIAL ADOPTION: A FOLLOW-UP 115 (1981) [hereinafter cited as SIMON & ALTSTEIN II]; Jones, *On Transracial Adoption of Black Children*, 51 CHILD WELFARE 156 (1972).

However, the age of the subjects is not the only limitation on the value of the studies in resolving the issue at hand. Most are based largely or exclusively on interviews of the parents rather than direct observation or questioning of the children. *See* GROW & SHAPIRO I, *supra;* L. GROW & D. SHAPIRO, TRANSRACIAL ADOPTION TODAY (1975) [hereinafter cited as GROW & SHAPIRO II]; B. JACKSON, *supra;* SIMON & ALTSTEIN II, *supra;* C. ZASTROW, OUTCOME OF BLACK CHILDREN-WHITE PARENTS TRANSRACIAL ADOPTIONS (1977); Grow & Shapiro, *Adoption, supra.* As a consequence, the data tend to reflect the parents' experience rather than the child's, whereas it is the *latter's* best interest that must govern the placement decision.

These studies also raise the spectre of observer bias. Most parents who have chosen to adopt a child of another race undoubtedly would not have done so absent a prior belief in the viability of interracial adoption. Moreover, their responses reflect on their own efficacy as parents. For these reasons, their responses are likely to paint an overly rosy picture of the experience and the effects on the child. *See* Chimezie, *Bold But Irrelevant: Grow & Shapiro on Transracial Adoption*, 56 CHILD WELFARE 75, 86 (1977) [hereinafter cited as Chimezie, *Bold But Irrelevant*].

The measures of "success" in some studies are too broad to shed much light on the specific aspects of child development and socialization that are likely to be adversely affected in an interracial adoption, such as learning of "survival skills" for coping with racism. *See* GROW & SHAPIRO I, *supra;* GROW & SHAPIRO II, *supra;* B. JACKSON, *supra;* SIMON & ALTSTEIN II, *supra;* C. ZASTROW, *supra;* GROW & SHAPIRO, *Adoption, supra.* Moreover, the category of "successful" placements covers a broad range from the borderline to the mediocre to the exceptional. *Id.* Thus there is little indication of the *relative* success of interracial, as compared to intraracial

adoptions. This is a major shortcoming in the context of the instant case, where the court found that *either* set of prospective parents would provide a good home for the child. As the court observed, the issue in such a case is not whether an interracial adoption would be "successful" but whether there is not a better alternative.

Finally, none of the studies has successfully controlled for non-racial variables. It has often been observed that parents adopting interracially tend to rate higher than others on factors such as financial resources, age and experience in parenting, religious conviction, and education. *See* SIMON & ALTSTEIN I, *supra;* D. Robertson, Parental Socialization Patterns in Interracial Adoption, (1974), *abstracted in* 35A DISSERTATION ABSTRACTS INT'L 5553 (1975); G. St. Denis, Interracial Adoptions in Minnesota: Self-concept and Child Rearing Attitudes of Caucasian Parents Who Have Adopted Negro Children, (1969) *abstracted in* 30A DISSERTATION ABSTRACTS INT'L 2633 (1969). The special problems of racial identity and coping skills may thus be underestimated or obscured due to the effect of other factors which result in a favorable overall assessment. Such findings are misleading when applied to a situation where, as here, the interracial alternative is found not superior, but equal, as to nonrace factors.

**6.** *See* GROW & SHAPIRO I, *supra* note 5; GROW & SHAPIRO II, *supra* note 5; B. JACKSON, *supra* note 5, at 115–26; S. KLIBANOFF & E. KLIBANOFF, LET'S TALK ABOUT ADOPTION 115–26 (1973); J. LADNER, *supra* note 5; SIMON & ALTSTEIN I, *supra* note 5; SIMON & ALTSTEIN II, *supra* note 5; A. SOROSKY, A. BARAN, & R. PANNOR, THE ADOPTION TRIANGLE 202–04 (1978); C. ZASTROW, *supra* note 5; Chestang, *The Dilemma of Biracial Adoption,* 17 SOC. WORK, 100 (1972); Chimezie, *Transracial Adoption of Black Children,* 20 SOC. WORK 296 (1975); Chimezie, *Bold but Irrelevant, supra* note 5; GROW & SHAPIRO, *Adoption, supra* note 5; GROW & SHAPIRO, *Not So Bold and Not So Irrelevant,* 56 CHILD WELFARE 86 (1975) [hereinafter cited as Grow & Shapiro, *Not So Bold*]; Jones, *supra* note 5; Jones & Else, *Racial and Cultural Issues in Adoption,* 58 CHILD WELFARE 373 (1979); Simon, *An Assessment of Racial Awareness, Preference, and Self-identity Among White and Adopted Non-White Children,* 22 SOC. PROBLEMS, Oct. 1974, at 43–57; W. Allen, The Formation of Racial Identity in Black Children Adopted By White Parents (1976), *abstracted in* 37B DISSERTATION ABSTRACTS INT'L 1888 (1976); D. Robertson, *supra* note 5; G. St. Denis, *supra* note 5.

ence presents risks which are not otherwise present, and the extent to which those risks may be reduced by affirmative steps on the part of the parents.[7] As two researchers sympathetic to interracial adoption have said,

> it was and still is accepted that the inracial adoption, when feasible, is preferable to the transracial adoption. The basic question about transracial adoption was whether it worked at all, and to what extent. [Grow & Shapiro, *Not So Bold, supra* note 5, at 88.]

Even the most outspoken advocates of interracial adoption, who see it as a means of addressing the fact that the need for placement of homeless minority children has historically outstripped the number of minority adoptive parents, do not contend that there is no risk of problems in social or psychological adjustment. Rather, they contend that the hazards can be reduced to a manageable level, and that racial differences should therefore not stand as an absolute barrier to adoption.[8] However, most authorities agree that intraracial adoption is preferable.[9]

The hazards of interracial adoption should not be exaggerated, but neither should they be ignored. An inevitably imprecise prediction about the effects of an interracial placement must be made in the context of all relevant circumstances, including any mitigating efforts by the par-

ents. But *when all other factors are in equipoise,* the *possibility* of an adverse effect, no matter how small or how unlikely, would suffice to permit the trial judge to tip the balance in the direction of the intraracial alternative.

The trial court found as facts that "[a]t a later stage, notwithstanding love and affection, severe questions of identity arising from the adoption and race most probably would evolve. In the world at large, as the circle of contacts and routines widens, there are countless adjustments which must be made." It concluded that the child's interests would probably be better served in the G. family. Given the equal balance of other factors, this conclusion is adequately supported if it is permissible to conclude that there is any potential adverse effect from the interracial alternative. That is indisputably the case here. Accordingly, the result below can be upset only if it is constitutionally impermissible to give any weight whatsoever to adverse effects on the child related to racial differences between herself and her parents.

## II. THE CONSTITUTIONALITY OF THE TRIAL COURT'S DECISION

### A. The Level of Scrutiny

A majority of the United States Supreme Court has not agreed on the standard of scrutiny to be applied to "benign" as op-

---

7. There is a broad consensus among professionals that interracial adoptions pose problems not present in the intraracial context. In one survey of social workers involved in child placement, 79 percent found that interracial adoptions are riskier. Grow & Shapiro II, *supra* note 5, at 50. Sixty-nine percent disagreed with the statement that "Growing up in our current-day society is as difficult for a black child in a black home as in a white home." *Id.* at 51.

8. *See* Grow & Shapiro I, *supra* note 5; Grow & Shapiro II, *supra* note 5; B. Jackson, *supra* note 5; S. Klibanoff & E. Klibanoff, *supra* note 6; J. Ladner, *supra* note 5; Simon & Altstein I, *supra* note 5; Simon & Altstein II, *supra* note 5; Chestang, *supra* note 6; Grow & Shapiro, *Adoption,*

*supra* note 5; Grow & Shapiro, *Not So Bold, supra* note 6. The position that intraracial adoption is preferable when other factors are equal is generally accepted even among organizations among whose primary functions it is to promote interracial adoption as an alternative for hard to place children. *See* Simon & Altstein II, *supra* note 5, at 70–74.

In contrast, the point of view adopted by the majority opinion—that intraracial adoptions should not be regarded as generally preferable with respect to identity formation and socialization of the child—is a comparative rarity among social researchers and commentators. *See* Jones & Else, *supra* note 5.

9. J. Ladner, *supra* note 5, at 124–25. *See also* the other authorities cited at note 6 *supra*.

posed to "invidious" racial classifications.[10] However, at least four justices are of the view that racial classifications that attempt to remedy the effects of past discrimination and do not stigmatize a particular racial group are subject to less exacting scrutiny than other racial classifications. Thus, a plurality of the Supreme Court subjected a medical school program designed to assure the admission of a specified number of minority students, to an intermediate level of scrutiny, instead of the strict scrutiny test. *Regents of the University of California v. Bakke,* 438 U.S. 265, 359–61, 98 S.Ct. 2733, 2783–2784, 57 L.Ed.2d 750 (1978) (Brennan, J., White, J., Marshall, J., and Blackmun, J., concurring in the judgment in part and dissenting in part). *See also Fullilove v. Klutznick,* 448 U.S. 448, 517–19, 100 S.Ct. 2758, 2794–2795, 65 L.Ed.2d 902 (1980) (Marshall, J., with whom Brennan, J. and Blackmun, J., join, concurring in the judgment). While these cases involved affirmative action, the authors of the cited opinions neither stated nor implied that *only* affirmative action could qualify as a benign use of a racial classification.

Employing the same analysis, the use of race in this case does not require application of the strict scrutiny standard. As in *Bakke* and *Fullilove,* the normal indicia of racial benignancy are present. First, the use of the racial factor does not stigmatize a particular racial group. In other words, the use of race in this adoption proceeding was not based on the presumption that one race is inferior to another, nor does it place the weight of the court behind racial bigotry and separatism. The trial judge used race as one of many factors to be weighed in calculating the child's best interests, not as a means of insuring racial purity or separation.

Secondly, though the consideration of race was not purposefully remedial, neither were its purpose and effect pernicious with respect to the distribution of burdens and benefits among racial groups. Indeed, the use made of race in this case should be even less open to objection than that in *Bakke* and *Fullilove.* There, the racial classification provided benefits to an identifiable class, to the detriment of another class, for the purpose of remedying the present effects of past discrimination. Here, the consideration of race seeks not to improve the position of any particular racial group, but simply to protect the best interests of the child, of whatever race.

However, the majority quickly dismisses the possibility that the consideration of racial differences made in this case could qualify for intermediate scrutiny as a benign use of race. It does so on the ground that, in the adoption context, "racial classifications over the years have resulted in particularly vivid examples of invidious discrimination." *Ante* at 786. But this distinction is clearly inconsistent with the position taken by the Supreme Court plurality favoring intermediate scrutiny. They proposed intermediate scrutiny in a case involving alleged race discrimination in admission to a public institution of higher education. No one who recalls the last twenty-five years of the history of this country could possibly believe that university admissions is not an area "where racial classifications over the years have resulted in particularly vivid examples of invidious discrimination." The fact that invidious uses of race have occurred, and continue to arise, is not a persuasive reason for rejecting intermediate scrutiny in a clearly benign case. If the *possibility* of invidious discrimination in the same context is all that is necessary to bar intermediate scrutiny—regardless of the fact that the actual consideration of race was clearly benign—then such scrutiny is never possible. That approach would place too extreme an impediment to benign and important uses of

---

**10.** The majority of this court prefers to state that "[a] majority of the [Supreme] Court has not accepted this intermediate standard for benign racial classifications . . . .", to which one must add that neither has the Court rejected intermediate scrutiny in that context. Until the Court as a whole addresses the issue, one cannot simply presume that intermediate scrutiny will be rejected (or adopted). Indeed, more Justices are on record in favor than opposed.

color consciousness. Unless and until the promised land of racial equality is achieved, it is unrealistic to blind ourselves to color in such instances.

Moreover, the consideration of race in this case differs from the prejudiced and separationist approaches taken in cases referred to in the majority's "historical perspective" in at least two fundamental respects. Since race is only one factor among many, many interracial adoptions will be permitted. This is not a classification entailing the separation of races, which would be "invalid without more." *Regents of the University of California v. Bakke, supra,* 438 U.S. at 358, 98 S.Ct. at 2782 (Brennan, J., concurring). Second, any tendency to reduce the number of interracial families is purely incidental to a non-racial, non-separationist purpose: to promote the best interest of each adopted child.

The difference between cases in which race-consciousness required the application of strict scrutiny and the present case is well illustrated by *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). In *Loving,* the Supreme Court struck down Virginia's anti-miscegenation statute, which made it a crime for a white and non-white person to marry. The state contended that the statute should be regarded as non-invidious because equal penalties were placed on any person engaging in an interracial marriage, rather than only the non-white spouse. The Court looked beyond this facade of neutrality and recognized that the sole purpose and function of the statute was to separate the races. Since the state had no non-racist and compelling purpose in preventing consenting adults of different races from marrying, the statute violated equal protection.

Here, in contrast, the purpose and predominant effect of the court's action is legitimate and compelling: protection of the child's best interests. It is also significant that only one side of the proposed interracial adoption consists of consenting parties: the H. family. The child is not of consenting age, and therefore it is the *court* which

is in the difficult position of standing in her shoes and judging what is in her interest. If the child had capacity to decide for herself, she would certainly not be prevented from taking note of the different race of those proposing to adopt her. When the court does the same on her behalf, there is no indication of invidiousness that necessitates the strictest level of scrutiny.

This situation should also be distinguished from one in which a standard that makes no ostensibly improper use of race is being subverted in a race-conscious way by those who apply it. *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), for example, provides an apt illustration. That case involved applications for licenses to operate commercial laundries. While the official criteria for the granting of license applications made no reference to race, in practice, the authorities denied licenses to Orientals while granting them to white owners of similar facilities. If it appeared in an adoption case that the trial court was manipulating non-racial criteria, or benign and appropriate race-conscious factors, so as to achieve an invidious goal, strict scrutiny should be applied and the ultimate result would no doubt be reversal.

I conclude that, under the view espoused by at least four Supreme Court justices, the consideration of race in this case is "benign" rather than invidious. Therefore, it may be justified by showing that it serves "important," rather than "compelling" governmental objectives, and is "substantially related to," rather than "necessary to," the achievement of those objectives.

B. *Constitutional Scrutiny of the Court's Decision*

The selection of the appropriate level of scrutiny is not determinative in this case, since the consideration of race is necessary to the achievement of a compelling governmental interest and thus comports with equal protection even under the strict scrutiny standard. *See, e.g., In re Griffiths,* 413 U.S. 717, 721–22, 93 S.Ct. 2851, 2854–2855, 37 L.Ed.2d 910 (1973); *Graham v. Richard-*

*son,* 403 U.S. 365, 375, 91 S.Ct. 1848, 1853, 29 L.Ed.2d 534 (1971); *McLaughlin v. Florida,* 379 U.S. 184, 196, 85 S.Ct. 283, 290, 13 L.Ed.2d 222 (1964). The interest at stake—protection of the prospective adoptee's best interest—is indeed compelling, a fact which the majority does not dispute. *Ante* at 786. It is, in fact, the only state interest that can justify the granting of an adoption petition.

A degree of race-consciousness is permissible to the achievement of that interest, because certain potential future hardships to the child arise when the parents are of a different race. The trial court's finding that such risks exist is more than amply supported by trial testimony. In turn, that conclusion, and the testimony addressed to it, find virtually unanimous support in the research and social science literature on the subject.

Some of the risks of interracial adoption involve the child's development of identity (including racial and cultural identity), self-esteem, and a sense of belonging in the family—relevant considerations which the majority recognizes as legitimate and important. One problem is the possibility that the child may not perceive herself as black or develop an identity as a black person.[11] There was evidence at trial that the foster parents would make efforts to alleviate this possibility. Even if the child is made aware of her black identity, however, other problems might develop. The child would then have to cope with the fact that she is different from her parents. As one of the expert witnesses in this case testified:

> If a child has to start out, "I'm different. I'm special," that child is being deprived of a strong and healthy concept of self that they could have in an environment where they do not have to deal with that kind of division twenty-four hours a day.

Another aspect of the identity problem is the possibility that the child may experience a "conflict of loyalties" as she grows older. If she identifies with the culture of her heritage, she may feel isolated from her family. If she identifies with her family, her skin color will always be there to remind her and others of her origins.[12] In other words, the child may be caught between two cultures and accepted by neither.[13] Even if the white foster parents were able to nurture the child's ability to perceive herself as black, there is little they could do to prevent the ambivalent feelings and rejection she may experience later in life.

In addition to a strong sense of identity, the black child must learn to develop certain survival skills. Regardless of how she is identified by herself or her family, she will be identified as a black person by society and will inevitably experience racism. Blacks and other minorities develop survival skills for coping with such racism, which they can pass to their children expressly, or more importantly, by unconscious example. *E.g.,* Chestang, *supra* note 6, at 101–03. Parents of interracial families may attempt to learn these lessons and then teach them, but most authorities recognize that this is an inferior substitute for learning directly from minority role models. J. LADNER, *supra* note 5, at 255; Chestang, *supra* note 6, at 102–04. Few white parents even claim they can teach such skills. J. LADNER, *supra* note 5, at 115. In one study, a third of interracial parents did not undertake affirmative efforts to teach them. The two thirds who did, did so predominately through secondary materials like books,

---

11. The importance of such development has been emphasized by sociologist Joyce Ladner: "A healthy integrated personality involves one's having a stable concept of self as an *individual* as well as a *group* (black) identity." J. LADNER, *supra* note 5, at 104.

12. B. JACKSON, *supra* note 5, at 19.

13. One 27-year-old black woman who was adopted by a white woman when she was five, describes the ambivalence that comes from being caught between two cultures: "I certainly couldn't have been accepted by white people, and I couldn't fit easily into a black world because, even though I was trying my best, things still didn't work out." LADNER, *supra* note 4, at 158. *See also* Jones & Else, *supra* note 5, at 378. In the present case, the trial court heard expert testimony on the importance to the child of acceptance by the larger community.

rather than by example, which is the normal method of socialization. SIMON & ALTSTEIN II, *supra* note 5, at 18. *See also* J. LADNER, *supra* note 5, at 115–16.

The racism experienced by blacks in this society may be encountered even more often by blacks in interracial families. Those with racist attitudes are undoubtedly opposed to interracial families. Acts of bigotry may be visited upon a child of a different race than his adoptive parents, regardless of the child's own race. Jones, *supra* note 5, at 163. Other children in the family may also become the targets of slurs. Chestang, *supra* note 6, at 103. Certainly the possibility of such traumatic experiences, with their attendant psychological effects, bears on the child's best interest. However, it cannot be emphasized too strongly that the desires of those opposing racial mixing are *not* to be weighed in the balance. The existence of such desires is significant only in that they may lead to acts directed against the child that adversely affect *his or her* interest. The majority fails to attach any significance to this distinction, stating flatly that "a well-intentioned effort to protect a child against community prejudice is [not] a proper justification, in itself, for an adoption decision." *Ante* at 789–790. That is so only if the "effort" consists of barring interracial adoption. But there is no reason for failing to weigh the effect of prejudice on the child's best interest as one factor among a multitude.

Since black children in interracial families may be even more exposed to racist attitudes than other blacks, their need for survival skills is more acute. White parents, however, tend to be less equipped to pass on those skills. *See* discussion at 53 *supra*. It is ironic and unfortunate that those black children most in need of survival skills are in environments which are the least able to provide them.

Racial slurs are not the only kinds of public reaction that pose problems for the child and his family. The range of responses is wide, and serves as a recurrent reminder that the child is "different" from his family. *See* B. JACKSON, *supra* note 5, at 13,

16–17; J. LADNER, *supra* note 5, at 209–15; C. ZASTROW, *supra* note 5, at 39–43. When some people see a child whose race is different from tht of his parents, they assume he is an illegitimate child or the product of a multi-racial marriage—circumstances they may disapprove of. Other people overreact in a well-meaning way, commenting on how wonderful it is to adopt a minority child. But however well-intentioned, such reactions have the effect of emphasizing to the child that he is "different", and can lead to a sense of isolation. B. JACKSON, *supra* note 5, at 13–14. Thus, while *all* adopted children have to cope with the fact that they are adopted, the interracial adoptee may have an even more difficult experience since his status is evident to the world at large.

> The child may at times feel that no-one understands his confused feelings about his natural parents or his pain at being called names. . . . Of course, every child at times suffers growing pains and feels no-one understands. But the black adopted child is visibly different from those he loves and this can give him a more complex situation to cope with. [*Id.* at 14.]

In sum, consciousness of a racial difference between the adoptive parents and the child is necessitated by society's compelling interest in fostering the child's best interest. The trial court took note of race only so far as required to ascertain the child's interest, explaining its concern both about problems related to identity, and to relations with the world outside the family. Its fact findings that such problems exist and that the child's best interest would therefore—all else being equal—be furthered in the G. home, are well supported by evidence of record.

## III. FLAWS IN THE MAJORITY'S APPROACH

### A. *An Overly Narrow View of the Relevance of Racial Differences to the Child's Best Interest*

As already set forth, there are a number of respects in which racial differences be-

tween parents and child may affect the latter's interest. However, the majority treats all factors it considers relevant as subsumed by the concept of identity. Moreover, there is reason to wonder how much the majority's race factor actually has to do with race. In enumerating the questions that should be explored, the focus is on the attitudes and behavior of the parents, and on the environment in which they live (e.g., whether the local schools are segregated). These were addressed at trial, and no one doubts that they are relevant. But the question that social scientists, the expert witnesses, and ultimately the courts have to grapple with is whether, *notwithstanding the very best of intentions and efforts on the part of the parents,* there are potential problems in the interracial context of a kind not expected in the intraracial case. The court should be permitted to conclude, as it did in this case, that such risks persist to some degree even when parental attitudes and the external environment are favorable. In other words, the issue is not exhausted simply by consideration of attitudes and environment; a difference in race between parents and child is of independent significance.

Yet the majority comes close to saying that differences in the relative viability of interracial and uniracial families are only coincidentally or indirectly related to racial differences, due to a possible statistical correlation between the race and favorable attitudes or external environment. *See ante* at 792, 793. However, there is no basis for excluding from consideration the more direct influence of race. While the majority de-emphasizes that influence, I do not believe its opinion can be read as eliminating it from evaluation.

If instead the majority opinion were read as reducing the race factor to attitudes about race, and environmental conditions bearing on race relations, paradoxical results would follow. The only reason this court is faced with a constitutional issue is that the trial court directly took the race of the parties into account. That is why there

is a racial classification calling for more than minimal scrutiny under the Equal Protection Clause. If, for example, all that the court had addressed were attitudes *about* race, without direct reference to the race of the parties in relation to the race of the child, there would be no ground for the majority to engage in strict scrutiny. In finding strict scrutiny satisfied, the court's opinion cannot be read as limiting the process to factors other than, albeit related to, race itself.

A second paradoxical result of an overly narrow view of the race factor is that it would require attention to the effect of race on identity even when there is no petition by prospective parents of a race different than the child's. If attitudes and the extra-familial environment were to dominate the analysis, the racial factor could not be overlooked in *any* adoption. *See Johnson v. United States,* D.C.App., 398 A.2d 354, 365 (1979) (In ascertaining whether an abuse of discretion has been committed, one criterion is whether all relevant factors have been considered). Yet neither prospective parents nor the court raise race as an issue when all involved are of the same race. The reason is simple: common sense and experience lead us not to expect *race-related* identity problems in the single-race context, and the expert evidence supports that view. Accordingly, when competing interracial and intraracial petitions are presented, it is hardly surprising if the focus of the court's discussion regarding race is on the interracial family. But for that family's involvement, there would be no issue. In this context, the absence of specific mention of the intraracial family in the trial court's discussion of race obviously reflects a finding that the potential problems identified by the court do not pertain to any significant degree to that family.

In this case, there was evidence regarding the love and concern each set of parents would have for the child. The H. family emphasized their positive attitudes toward the child's race and culture, which had already been exhibited in the raising of an-

other black child in their family.[14] Both families had the opportunity to present any and all evidence regarding their respective abilities to raise the child, including attitudes related to race. But having considered all non-race facts, including the treatment that each family would give the child, the court concluded that the petitions had equal merit.[15] Thus the trial court concluded that the race of ·the parties tipped the balance, however slightly.

If the race factor really has little to do with the race of the parties, as the majority appears to believe, then it would not be unusual to find that a child's identity, including racial identity, would be *more* secure in an interracial placement than an intraracial one. The majority thus proposes what appears, at least superficially, to be a fair and neutral approach, in which neither interracial nor intraracial adoption is preferred. The majority says "the court cannot properly weight [the race factor], either automatically or presumptively—*i.e.,* without regard to evidence—for or against cross-racial adoption." *Ante* at 787. To do otherwise would "add a racially discriminatory policy" and give the intraracial adoption a "head start." *Id.* If such language simply means that the court is not to rule out interracial adoption, inject a personal disapproval of interracial adoption, or give racial differences an undue weight as compared with other factors, it is unobjectionable. But the prescription is clearly incorrect if it means that the court cannot give weight to evidence that, other things equal, intraracial adoption tends to further a child's interest more/ than interracial adoption. To put such relevant facts into the balance is not evidence of bias. To the contrary, their exclusion would give a "head start" to the interracial alternative.[16]

14. *See supra* at 40.

15. *See* note 3 *supra.*

16. The majority later states that the race factor must be considered "without preference for the race of any party." *Ante* at 787. I concur in this conclusion. Certainly there is no justifica-

Thus the more evenhanded approach is to take note of the fact· that there are some respects in which interracial adoption presents potential problems that are not significant in the intraracial context. *See* section II B *supra.* To reiterate just one example, in the uniracial family, race does not serve as a constant reminder to the world at large and the child that he is adopted. Thus while the positive attitudes and environment of the interracial family are relevant, by way of mitigating some of the problems, it would be difficult to regard them as eliminating all risks entirely, much less making the interracial alternative *superior* as to this factor. This approach is supported by the record and was evidently adopted by the trial court, which said,

> [*N*]otwithstanding love and affection, severe questions of identity arising from the adoption and race most probably would evolve. In the world at large ... there are countless adjustments which must be made.

As discussed above, the social researchers—even those who advocate interracial alternatives—generally accept the premise that where an intraracial placement is available and other factors are equal, it is preferable. Not even appellee's expert witness contended that interracial placements in general, or the H. family in particular, would be superior as far as race-related considerations are concerned.

If an approach taking account of potential problems associated with interracial adoption amounts to a "preference" for intraracial adoption, it is an entirely permissible one. Such a preference is no less legitimate than a preference for a /two parent family or for parents with adequate resources to raise the child. If, in the guise of neutrality, the majority's framework rules out of order a preference for intrara-

tion for a policy favoring black petitioners to white ones or vice versa. However, if the majority's statement meant that a court cannot take note of whether the petitioners' race is the same as that of the child, regardless of what that particular race happens to be, I would disagree for the reasons elaborated in the text.

cial adoption that is supported by evidence, it introduces a bias against adoption by the black intraracial family. It is just as prejudicial to eliminate a legitimate consideration as it is to introduce an illegitimate one.

### B. *The "Historical Perspective"*

The majority gets off the track in suggesting that the possibility of a prejudiced or bad faith use of race bears on either the result or the remedy in this case. The majority reviews statutory and case law that today is rightly recognized as founded on unjust racial attitudes or inaccurate assumptions. *Ante* at 788. Indeed, historically the law has reflected the racial attitudes of those in power. *See generally* A. HIGGINBOTHAM, IN THE MATTER OF COLOR (1978). For example, there is one court's conclusion that mixed race children

> ... will have a much better opportunity to take their rightful place in society if they are brought up among their own people. [*Ward v. Ward*, 36 Wash.2d 143, 145, 216 P.2d 755, 756 (1950).]

Needless to say, I concur in the proposition that appellate courts must be vigilant in correcting such instances whenever they occur. But there is not the slightest indication that improper attitudes or preconceived factual assumptions influenced the decision below; indeed, every indication is squarely to the contrary. The fact that discriminatory uses of race have occurred is not a reason to eliminate entirely legitimate uses. As explained in section II A, *supra,* this history does not justify a refusal to apply intermediate scrutiny to a benign consideration of race. Neither should it bear on the application of the standard that is chosen.

### C. *Substantiality of the Trial Court's Consideration of Racial Differences Between Parents and Child*

Although the majority does not acknowledge some of the reasons that it is appropriate to take note of the race of the petitioners, it nonetheless decides that compelling interests justify attention to race. Accordingly, the statutory authorization of the consideration of race is upheld. In examining the trial court's exercise of discretion, the majority finds that no proper factor was ignored, and no improper factor was considered. How then does it arrive at the conclusion that the trial court's consideration of the "racial factor" requires reversal? It does so by indicating that the court's reasoning may not have been "substantial," and "based on a firm factual foundation."

In my view, the suggestion that the court's reasoning regarding the use of face was anything but substantial is implausible, and clearly belied by the record. Although the parties presented considerable lay and expert testimony addressing the merits of an interracial adoption at their own initiative, the trial court requested and received additional expert testimony. Rather than granting an immediate ruling, the court reserved decision until it had had a further opportunity to weigh the issues. Its written order devoted more discussion to race than to any other factor. It took great care to point out that it considered the possible effects of an interracial adoption to be only one factor among many, not the basis of a per se rule. It identified the concerns that led to the conclusion that adoption by the G. family would be preferable, *i.e.,* that problems of psychological and social adjustment might arise in the adolescent years if the interracial alternative were adopted. This explanation clearly indicated that expert testimony to that effect was credited. In short, every indication is that the trial court's reasoning, particularly as regards the race issue, was thoughtful, restrained, and serious: in a word, substantial. The "firm factual foundation" for the court's reasoning and conclusions is clearly present in extensive record testimony. That the court's reasoning was in fact based on that record is amply indicated by the court's reference to the risks of interracial adoption that come to fruition in adolescence, and to relations with the world outside the family. There is no basis for supposing otherwise.

### D. *Seeing Less in the Trial Court's Reasoning Than Was Actually There*

As the majority apparently recognizes, its conclusion can only be reached, if at all, by

departing from the normal procedure for the review of discretionary trial court rulings. In *Johnson v. United States, supra,* we drew a fundamental distinction between the degree of explanation ordinarily required of a trial court and that expected of administrative agencies for review of their respective exercises of discretion. As aptly explained in *Washington Public Interest Organization v. Public Service Commission,* D.C.App., 393 A.2d 71 (1978), *cert. denied sub nom., Potomac Electric Power Co. v. Public Service Commission,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979), review of agency action under the District of Columbia Administrative Procedure Act and similar statutes providing for review of agency action requires a rather detailed statement of findings and reasoning. For a number of reasons, several of which are discussed in that case, it is both feasible and necessary to require extensive written explanations from agencies. Agencies exist in large part because they can develop the sort of specialized expertise in a narrow policy area that the courts and the legislative branch are unable to do. The records in such cases are also often voluminous and highly technical. Without rather detailed explanation, a reviewing court may be at a loss to understand the decision and the significance of the data in the record.

As we explained in *Johnson,* it is usually neither necessary nor feasible to require such detail in the case of review of judicial decisions. By definition, such matters are within the judicial sphere, rather than confined to specialized expertise. Indeed, the reviewing court is the source of the authoritative rulings that guide the trial court's discretion. Trial judges, unlike agencies, deliver final judgments and numerous interlocutory rulings on a daily basis. We thus concluded in *Johnson* that a trial court need not make a lengthy written exposition of its reasoning. Accordingly, if the trial court opinion alone will not suffice for purposes of judicial review, this court can search the record and infer the court's reasoning based on the applicable legal standards and the results reached. *Id.*

But the majority treats the trial court's opinion as if it *constituted* the court's reasoning process rather than merely post hoc evidence of it. Inexplicably, the majority cites *Johnson* as support for the proposition that the court's attention to the race issue must be presumed to be limited to the words contained in its order. It relies on a quoted observation that it is impractical to expect a detailed explanation of decisions rendered during trial. But this fact is explicitly cited *as an example* of why one may flesh out a court's reasoning with an eye to the record. *Johnson* neither stated nor implied that looking to the record to fill the interstices in the court's expressed reasoning is precluded except in the case of decisions in the midst of trial.

What the majority seems to suggest is that trial court decisions are presumptively to be treated in the same manner as administrative decisions: unless there are exigent circumstances making it impractical for the trial court to deliver a lengthier opinion, a reviewing court must read the court's words in pristine isolation from the record on which they are based. According to the majority "Because the trial court's decision here was rendered comfortably after trial ... the general justification for requiring us to 'examine the record and infer the reasoning' the trial court used ... is not present here." *Ante* at 791. To my mind, the fact that the decision in this case was deferred until after a period of reflection is not dispositive of whether we may look to the record. The trial court could have rendered its decision orally at the conclusion of the evidence. *See* Super.Ct.Civ.R. 52(a). The paradoxical result of the majority's approach would be to make reversal of a decision—as embodied in the court's opinion—more likely if it is made in written form after a period of reflection than when it is rendered on the spot.

The majority also states that the Constitution prevents this court from looking to the trial record as an aid in understanding the court's reasoning. To my knowledge

there is no judicial authority whatsoever for this proposition. The cited cases, *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), and *Compos v. McKeithen,* 341 F.Supp. 264 (E.D.La.1972) (three judge court), at most support the proposition that the party seeking to uphold the constitutionality of state action bears the burden during subsequent judicial review of that action of demonstrating that the action satisfies the appropriate level of constitutional scrutiny. That is not in dispute. Nowhere do the cited passages state or imply that a reviewing court is ever constitutionally precluded from examining a trial court's reasoning in light of the trial record.

It is important to bear in mind that this is not a case in which the trial court simply announced the result of its deliberation. An economical but clear explanation was given. If, as the majority contends, resort to the record is necessary in order to confirm that the court rendered a proper decision, it is only by way of fleshing out the explanation that was given: (viz., that certain problems which would not be expected in the intraracial context might arise during adolescence in the interracial adoption under consideration).

I agree with the majority that there is a limit on how far we should go in inferring reasoning from the record. But to push this constraint as far as is necessary to overturn the trial court's decision in this case strikes me as absurd. It requires us to tear the court's words from the evidentiary context from which they grow. We should not be surprised that, by uprooting the court's decision from the ground which gives it life, we prevent it from sustaining itself.

### E. Implementation of the Majority's Three Step Procedure

However, even accepting the majority's approach to judicial review and its three step procedure for considering race in the adoption context, it is difficult to see why reversal is thought to be required in this case. The majority concedes that the first step—evaluating "how race is likely to affect the child's development of a sense of identity"—was satisfied. Because of the unique posture of this case, the third step—judging "how significant the differences between the families [with respect to racial identity] are when all the factors relevant to adoption are considered together"—also cannot serve as a basis for reversal. The trial court found that the race factor favored the G. family, and that all other factors were in equipoise. Therefore in this case the magnitude of the differential as to the race factor is of absolutely no consequence; any weight, no matter how slight, could suffice to tip the balance.

Thus, according to the majority's framework, the need for reversal should depend on whether the second step is satisfied. This step requires that the court compare how race will affect identity in each family. I am at a loss to understand how the majority can suggest that the court's conclusions may not have been based on a comparison of the parties with respect to this factor, and that its reasoning may not have been "substantial." In searching for a particular tree—an explicit statement that the potential problems which could arise in the H. family were *not* expected in the uniracial G. family—the majority seems to have lost sight of the fact that it is standing in the midst of a forest. The entire enterprise of judging the competing adoption petitions is a matter of comparing how each family rates with respect to each factor and then determining which placement is preferable overall. I would have thought—and I daresay the trial judge would have as well—that this was so elementary and taken as given by all involved that it was unnecessary for the court to state the proposition in its opinion. But if an explicit statement was required, it was supplied by the trial court:

> The Court does not conclude [an interracial family such as the H.'s] could not sustain itself. Rather the question is, is there not a better alternative?

The court then concluded that adoption by the G. family was a "better alternative." It is difficult to imagine words more clearly conveying a comparison of the two families as to the racial factor.

A line by line reading of the opinion reveals that the comparison of the families with respect to race was both substantial and based on the record. The court began its discussion by referring to the expert testimony and joining in the experts' dismay that there is not more conclusive research on the relation of race to adoption. It is evident that the discussion followed was founded on such predictions as the experts could give based on what is known about interracial adoption and on their knowledge of the particular parties involved. The court noted that "no conclusive absolutes are to be drawn on the basis of race. It would seem, however, entirely reasonable that as the child grows older the ramifications of this problem would increase." It is clear that "the ramifications of this problem" refers to social and psychological risks associated with interracial adoption, above and beyond those that inhere in adoptions in general. The succeeding sentence explicitly indicates that the court took into account the positive attitudes and efforts which would tend to mitigate those problems: "At a later stage, notwithstanding love and affection, severe questions of identity arising from the adoption and race most probably would evolve." Having stressed the identity issue, the court then referred to relations with people outside the family, saying, "In the world at large, as the circle of contacts and routines widens, there are countless adjustments which must be made." Both types of considerations were clearly founded upon more than ample record evidence. I find implausible the majority's assertion that, while ample record support is present, the trial court may not have intended to rest its reasoning on that evidence. It was not necessary for the court to recite the testimony, at the risk of having it disregarded by this court.

17. Emphasis supplied.

The majority, however, finds the lack of "specific findings . . . as to how race would be likely to affect this *particular* black child" in the H. & G. families to be fatal.[17] *Ante* at 793. However, the effort to distinguish a "generalized" judgment from a "particularized" inquiry concerning the individual family before it is misleading. This approach seems quite plausible on the surface, but the supposed distinction blurs considerably on closer examination. Of course, the statement that "this family is of a different race than D.G." would be true of a great many potential adoptive families. But the same is true of virtually any other relevant fact including those emphasized by the majority (e.g., living in an integrated neighborhood, attending an integrated school). That such factors may have positive effects is no less a "generalization" than the type of inference that the majority criticizes. Indeed, where the goal is prediction of future conditions such as how a child's interests will be served by a given adoption, no piece of evidence has any probative value unless it is possible to relate it to the past experience of other adoptive families. Only then can one infer (generalize) therefrom that the experience of this family is likely to be similar. Thus there is nothing suspect about reliance on testimony based on "generalization" from the experience of other families who are similarly situated in relevant ways, including racial differences between parent and child.

The fact that the adoption decision is inevitably based on prediction and generalization is important in another way: it places limits on the extent to which specific findings can be meaningful. Of course, one could recite each piece of evidence individually, but it would be an exercise in futility to attempt to attach a discrete value to each bit thereof. Rather, what a court must do in such situations is to look at all the evidence and judge the interrelated whole, arriving at the broad conclusion that, on balance, one alternative seems pre-

ferable to the others. The majority's discussion of the factors to be considered when interracial adoption is proposed will no doubt provide useful guidance to trial judges. But I question whether finding an opinion such as that of the trial judge in this case to be insufficiently detailed will have a further and independent effect in improving the quality of adoption decision-making. As a practical matter, the most we can do is to provide guidelines for the court's discretion, and then place our reliance on the trial court to arrive at fair judgments. In this case, the court devoted more space to the discussion of the race issue than to any other factor. Of course, it could have said more. But what it did say succeeded in demonstrating that race was considered only in a limited and entirely proper way. There was no indication that countervailing evidence favoring the losing party was excluded from consideration.

### CONCLUSION

The Constitution does not require a court to blind itself to realities affecting a child's best interest, even when those facts depend on the respective races of the parents and child. What is in the best interest of a child is a *factual* question to be resolved by the trial court. We cannot require that courts, even indirectly, find facts contrary to their view of the evidence. That a majority of a panel of this court might have drawn different conclusions from the evidence concerning interracial adoption in general and the G. and H. families in particular is not a basis for reversal. While ostensibly accepting these propositions, the majority's opinion may be read as circumscribing the consideration to be given to race, to an extent which I think is unjustifiable. Probably more significantly, the majority has narrowed its examination of the court's reasoning so as to see less than is actually there. The result is to lead the majority astray from the relatively straightforward issue posed by this case: whether it is constitutionally permissible and appropriate for a court to give *any* weight to evidence that an interracial adoption presents certain risks to a child's welfare, which may be mitigated though not eliminated by special efforts on the part of the parents. I think that this factor may and should be included among the many others relevant to the child's best interest. It follows that, in a case such as this, where other factors are in equipoise, the interracial factor may sway the result. Since race-consciousness in this limited context is permissible, and the court's judgment as to the child's best interest is supported by the evidence and not clearly erroneous, the result should be affirmed.

We must live in the world as it *is* while we strive to make it as it should be.

